LIN HSI HSU *et al.*, Appellants, v. THE HUMAN RIGHTS COMMISSION *et al.*, Appellees.

First District (1st Division) No. 1—87—2592

Opinion filed January 9, 1989.

Erwin Cohn & Associates, of Chicago (Charles A. Cohn and Erwin Cohn, of counsel), for petitioners.

Neil F. Hartigan, Attorney General, of Springfield (Shawn W. Denney, Solicitor General, and Respicio F. Vazquez, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Human Rights Commission.

Kenneth N. Flaxman and Elizabeth Dale, both of Chicago, for other respondents.

JUSTICE BUCKLEY delivered the opinion of the court:

This appeal arises from a housing discrimination complaint filed in the Illinois Department of Human Rights by Eva and Michael Horton against Lin Hsi Hsu and Han Cheng Hsu. On July 3, 1986, the Human Rights Commission (Commission) entered an order finding that the Hsus' denial of rental housing to the Hortons was motivated by racial discrimination, thereby reversing a prior order of an administrative law judge. Damages and attorney fees were subsequently assessed against the Hsus, and they now appeal. We affirm.

The following testimony was presented on September 4, 1984, before the administrative law judge of the Commission. On March 21, 1983, complainants Eva and Michael Horton, a black couple, responded to an ad in the Chicago Tribune offering for rent a single-family, five-bedroom dwelling at 7879 Northway Drive, Hanover Park, Illinois. After telephoning the owners of the house, Mr. and Mrs. Hsu, who are Chinese, the Hortons went to see it. They claim that when Mrs. Larkin, the white tenant, opened the door, she "hesitated" or "paused" for a few seconds with her mouth agape. She then left the couple waiting in the front hallway for about five minutes before showing the house.

Later that day, Mr. Horton phoned Mr. Hsu, expressed his interest in the house, and asked to fill out an application. When asked if the house was too large for him, Mr. Horton replied "no" because he

currently owned a large home. He testified that Mr. Hsu told him he would call him back that evening, but when Hsu failed to do so, Horton called him a few days later and again expressed his desire to fill out an application for the house. After discussing the rent and Horton's income, Hsu agreed to meet him on Saturday, March 26, at 6 p.m. at the Hortons' home in Carol Stream.

On that Saturday, according to Horton, Hsu called him at 8 p.m., told him he got lost, and that, in any event, he had made a "judgment" to rent the house to another family. When Horton found out that the advertisement was still in the paper on Monday, March 28, he felt that he had been discriminated against, as did his wife after she learned on Saturday evening that the house had been rented. On cross-examination, Horton admitted that Hsu would have no way of knowing he was black unless told by his tenant.

Mr. Hsu denied that his decision not to rent to the Hortons was based on their race. He stated that during his first conversation with Mr. Horton, he was told that the couple only had a grandchild living with them. Hsu testified that he preferred to rent the house to a large family as they were less likely to be dissatisfied with the high utility bills and the upkeep of a large home. He explained that he did not make definite arrangements with the Hortons at that time because after discussing the rent, he thought the Hortons would want to look at the house again. When Mr. Horton called a second time, Hsu told him it was not his practice to take applications as he only owned one rental property, but he did agree to meet the Hortons on Saturday. He had previously made appointments to meet the Muhatims, an Indonesian family having four adults and three children, at 5 p.m., and the Zahitas, a white family of three, at 7 p.m. on that same Saturday.

While meeting with the Muhatims at a hotel in downtown Chicago, the Hsus orally agreed to rent to them for $600 per month rather than the $650 advertised rate. Mr. Hsu testified that he left the Muhatims at 6 p.m., and arrived at a gas station near Carol Stream at 6:30 or 7 p.m. at which time he called the Hortons because he was lost. When Hsu received a busy signal, he proceeded to the Zahita household, where he stayed for 30 minutes. He did not inform the Zahitas until the next day that the dwelling had been rented.

On Monday, March 28, the Hsus received a $100 deposit from Mr. Muhatim. By a document of the same date, the Hsus entered into a lease agreement with the Muhatims to commence April 1, 1983, although the Muhatims requested that the term of the lease not start until May 1, 1983.

After hearing the above testimony, the administrative law judge (hereinafter ALJ) issued a recommended order and decision in favor of the Hsus (hereinafter respondents). Despite his finding that certain actions of respondents "cr[ied] out for an explanation," the ALJ refused to impute knowledge of the Hortons' (hereinafter complainants') race to respondents. The judge stated:

> "In opposition to the flimsy circumstantial evidence that the tenant advised Respondent of Complainants' race, Respondent Lin Hsi Hsu testified, credibly, that he did not know of Complainants' race at any relevant time. Thus, I must conclude that Complainant has not proven by a preponderance of the evidence that the tenant communicated to Respondent that Complainants were black."

The ALJ noted, however, that but for this lack of proof, it "would be hardpressed to not find that Respondents violated the Human Rights Act."

The Commission ultimately reversed this order and remanded the cause for a determination of damages and attorney fees, reasoning that the ALJ "made a mistake of law" in requiring direct proof of respondents' knowledge of complainants' race. Rather, the Commission ruled that given the fact that the tenant had ample opportunity to inform respondents of complainants' race, the ALJ should have inferred a racial motive where respondents treated complainants differently than other similarly situated, nonblack applicants. The Commission, citing an evidence hornbook, wrote, "Where circumstantial evidence exists which makes it likely that something has taken place, a fact finder in a civil case may infer the event based upon the circumstantial evidence." The Commission's decision concludes:

> "Thus, the Administrative Law Judge should have inferred knowledge of the Complainants' race based upon the subsequent actions of the Respondents. Because the Administrative Law Judge did not make this inference, the Recommended Order and Decision cannot be accepted. Instead, the Commission finds that the denial of rental housing by the Respondents in this case was motivated by the Complainants' race."

Upon remand, the ALJ recommended an award of $2,000 to complainants for humiliation and embarrassment, and $1,907.85 as their attorney fees. The Commission modified the recommended order by increasing the attorney fees to $2,585.60, the amount initially sought by complainants plus costs subsequent thereto.

The thrust of respondents' appeal is that the Commission erred in substituting its judgment for that of the ALJ, thereby violating its

own standard of review embodied in section 8—107(E)(2) of the Illinois Human Rights Act (Human Rights Act), which directs the Commission to "adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence" (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(2)), and section 5300.1120 of the Illinois Administrative Code (56 Ill. Adm. Code 5300.1120 (1986)), which requires the same. Complainants and the Commission, in turn, citing *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138, contend that the Commission's findings were *"prima facie* true and correct" and urge this court to consider only whether the Commission's decision is against the manifest weight of the evidence. We believe that complainants and the Commission properly delineate our scope of review in this matter.

▮ Final administrative decisions of agencies like the Commission are subject to judicial review pursuant to section 8—111 of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 8—111). On administrative review, this court should not reweigh the evidence, assess the credibility of witnesses, or review the ALJ's findings, but rather must ascertain whether the final decision of the administrative agency, such as the Commission here, is against the manifest weight of the evidence. (*Milan v. Human Rights Comm'n* (1988), 169 Ill. App. 3d 979, 523 N.E.2d 1155; *Department of Corrections v. Adams* (1986), 146 Ill. App. 3d 173, 496 N.E.2d 1138.) For this court to overturn the Commission's decision as contrary to the manifest weight of the evidence, an opposite conclusion must be clearly evident or the decision palpably erroneous. (*Smith v. Chicago Board of Education* (1988), 176 Ill. App. 3d 109.) If the record contains any evidence to support the agency's decision, that decision must be upheld. *Lipsey v. Human Rights Comm'n* (1987), 157 Ill. App. 3d 1054, 510 N.E.2d 1226.

▮ With this limited standard of review in mind, we must now determine whether the Commission's decision was indeed against the manifest weight of the evidence warranting reversal. Section 3—102(A) of the Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 3—102(A)) makes it unlawful for an owner of rental property to refuse to engage in a real estate transaction with another person on the basis of, among other things, race. As the Seventh Circuit has held with respect to section 3604 of the Fair Housing Act, a provision similar in language and intent to the State statute at issue here, the prerequisites of a *prima facie* case of housing discrimination are as follows: (1) complainant belong to a minority; (2) respondent be aware of it; (3) complainant be ready and able to accept respondent's offer to rent; and (4) respondent refuse to deal with complainant. Once these ele-

ments are established, the burden then shifts to the respondent to show a legitimate reason for refusing to deal with the complainant. (*Turner v. Human Rights Comm'n* (1988), 177 Ill. App. 3d 476, 488, citing *Hamilton v. Svatik* (7th Cir. 1985), 779 F.2d 383.) After articulation of such reason, complainant must then show the reason is a mere pretext, either by direct evidence that a discriminatory reason more likely motivated respondent or by indirect evidence that the respondent's explanation is unworthy of belief. *Turner v. Human Rights Comm'n* (1988), 177 Ill. App. 3d 476, 488, citing *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089.

■ With respect to complainants' *prima facie* case, the sole element in dispute is respondents' knowledge of complainants' race. As the Commission pointed out, citing *Urisote v. Madison County Housing Authority* (1977), 4 Ill. Fair Employment Prac. Rep. 46, such knowledge can be inferred from the disparate treatment complainants were subjected to in relation to the other similarly situated, nonblack applicants.[1] Specifically, the Commission refers to respondents' failure to keep their appointment with complainants while visiting both nonblack applicants, and their efforts to discourage complainants by failing to return their call and by questioning their interest in such a large house. These actions amply support the Commission's inference that respondents' current tenant, who showed surprise at complainants' appearance and left them in the front hallway for several minutes, informed respondents of complainants' race.

Respondents argue that they presented a nondiscriminatory reason for not renting to complainants: they preferred to rent to a large family that would be less dissatisfied with the high bills and upkeep of a five-bedroom house. They contend that they were unable to meet complainants that Saturday due to circumstances beyond their control, and in any event, the house had already been rented to the Muhatims. Again, in our view, there was sufficient evidence before the Commission from which it could conclude that this explanation was a mere pretext, particularly where respondents rented to people who, unlike complainants, requested modifications in the lease, including the rental price and its term. Furthermore, if the house had in fact been rented on that Saturday to the Muhatims, it would make no

---

[1]Respondents attempt to distinguish *Urisote* from the instant case on the ground that it involves employment discrimination as opposed to housing discrimination. Yet, as this court has most recently recognized in *Turner v. Human Rights Comm'n* (1988), 177 Ill. App. 3d 476, the principles we apply in housing discrimination cases in fact originated in the context of employment discrimination.

sense for respondents to not enter into a firm agreement with them at that time, still meet with the Zahitas, a nonblack family of three, for 30 minutes that evening without mentioning the earlier agreement, and not pull their ad from the newspaper subsequent thereto.

Pursuant to section 8—107(E)(1) of the Human Rights Act, the Commission is free to modify or even reject the recommended order and decision of the hearing officer if it is against the manifest weight of the evidence. (Ill. Rev. Stat. 1987, ch. 68, par. 8—107(E)(1).) We, as a reviewing court, however, do not pass upon the propriety of the Commission's findings in this regard. "Rather, we pass upon the actual determination of the Commission just as if the Commission were the original fact finder." *Carver Lumber Co. v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 419, 424, 515 N.E.2d 417, 421.

Thus, given our determination that the Commission's order is not against the manifest weight of the evidence, we affirm its judgment in favor of complainants.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.