ROBERT ATKINS, Plaintiff-Appellant, v. THE CITY OF CHICAGO COMMISSION ON HUMAN RELATIONS *ex rel.* MICHELLE LAWRENCE, Defendant-Appellee.

First District (6th Division)   No. 1—94—3907

Opinion filed June 21, 1996.

Mark E. Wohlberg, of Chicago, for appellant.

Patricia Pierce Davis, of Hawthorn Woods, for appellee Michelle Lawrence.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and John Ehrlich, Assistant Corporation Counsel, of counsel), for appellee City of Chicago Commission on Human Relations.

JUSTICE RAKOWSKI delivered the opinion of the court:

Claimant, Michelle Lawrence, filed a complaint with the City of Chicago Commission on Human Relations (the Commission) pursuant to section 5—08—030 of the Chicago Fair Housing Regulations (Chicago Municipal Code § 5—8—030 (amended December 21, 1988))

(the ordinance) alleging respondent, Robert Atkins, discriminated against her by rejecting her application to rent an apartment on the basis of race, sex, or marital status. The Commission found Atkins discriminated against Lawrence based on race and awarded her $500 in damages, $4,935 in attorney fees, and assessed a civil penalty in the amount of $300. The circuit court of Cook County affirmed. Atkins appeals, contending: (1) the Commission's decision is against the manifest weight of the evidence; (2) the Commission was not authorized to award attorney fees; (3) he was entitled to a jury trial on the issue of damages; and (4) the Commission committed reversible error in excluding evidence. For the reasons that follow, we affirm.

## I. FACTS

Atkins owns rental property located at 2132 North Winchester. He sought to rent one of the apartments and entered into an agreement with North Clybourn Realty. Karen Biazar, of North Clybourn, met Lawrence in March of 1991, and showed her Atkins' apartment. When Lawrence viewed the apartment, Atkins opened the door to let them in. While Atkins was present, Lawrence stated she needed to move in early, around March 23, as she was going out of town at the end of the month. Biazar confirmed this conversation. Atkins admitted there was a conversation, but testified he did not believe Lawrence told him she was going out of town. He said he asked her why she needed to move early but did not remember her response. Atkins stated he told Lawrence she could not move in early but if her application was approved, she could store her belongings in the basement.

According to Atkins, Lawrence's request for an early move in "[t]hrew up a red flag" because, in his experience, it was very unusual for a tenant to move out of an apartment mid-month. Based on this, Atkins stated he conducted his own investigation of Lawrence.

After seeing several apartments, Lawrence tendered a $500 check to Biazar payable to Atkins and a $30 check for a credit report. Shortly thereafter, Biazar forwarded the check, the application, and a TRW credit report to Atkins. The credit report showed three lines of credit in good standing and made no reference to a student loan.

After receiving these documents, Atkins called Biazar to make arrangements to view Lawrence's current apartment. Atkins stated he made this request because he spoke with Thomas Forran, assistant manager of Lawrence's current residence, and the conversation threw up another red flag. Forran did not recall speaking with Atkins.

According to Biazar, Atkins' request was unusual and was made

prior to him receiving any information about Lawrence's rent-paying habits from her current landlord, as Biazar had not yet received this information. Biazar called Lawrence and advised her of Atkins' request. According to Lawrence, Biazar told her if she did not comply, Atkins would not rent to her. Lawrence gave her consent.

Atkins testified he found Lawrence's apartment "quite messy in other than normal circumstances." There was food on the floor, a lot of garbage, or a garbage bag, and food on the counter top. He noticed a "cat odor that shocked [him]." According to Atkins, at this point, he pretty much decided Lawrence was not the type of tenant he wanted.

Atkins did not remember when he first advised Biazar he was rejecting Lawrence but believed it was March 10 or 12. He testified he told Biazar he was rejecting Lawrence because of her credit problem, the money owing to her previous landlord, the cat, and just a "bad history." According to Biazar, she spoke with Atkins on March 11, at which time he rejected Lawrence but gave no reasons.

Lawrence called Biazar on March 11 and was advised Atkins had rejected her but had not given any reasons. When Lawrence was told she was rejected, she was "surprised and shocked," highly distraught, and believed she had been discriminated against. At this time, Biazar also told Lawrence "there had been some blemishes on [her credit report], but that [she] had three lines of credit that were fine."

Atkins testified he had a conversation with Lawrence after he saw her apartment. According to him, he asked her, "Whose cute little cat is that?" and she replied it was hers. He then told her he did not allow pets. According to Atkins, "[Lawrence] got real kind of abusive and hung up on [him]. And she said 'I'm not getting rid of no cat for your apartment,' and she hung up on [him], and that's the last contact [he] had with [Lawrence]."

Atkins testified he spoke to Biazar after Lawrence hung up on him and told her about the conversation. He stated he told Biazar he rejected Lawrence because of her messy apartment, the cat, the problems with her previous landlord, and the student loan. As noted above, Biazar denied being given these reasons.

Lawrence denied having the above conversation with Atkins and testified the only conversation she had with him was when he opened the door to show her the apartment.

At the hearing, Atkins gave five reasons for rejecting Lawrence: (1) her "terrible" credit background; (2) the outstanding balance with her current landlord; (3) her instability in previous rental history; (4) the cat; and (5) her apartment being a mess.

Atkins talked to Connie Williams with the Commission and, ac-

cording to Atkins, he told Connie Williams he did not rent to Lawrence because rent was owed to Lawrence's previous landlord and, based on the credit report submitted by Biazar, he thought Lawrence had a bit of instability and he was unsure whether she could afford the apartment.

Connie Williams, an investigator for the Commission, received a complaint from Lawrence in March of 1991. When Williams met with Atkins, he told her he refused Lawrence's application because her apartment was dirty and she left her landlord with a rent balance.

Lawrence testified her roommate, Shawn Williams, was keeping a cat for someone and that it had been there for about a week. Lawrence denied having any pets in the apartment at any other time and denied she owned a pet.

Lawrence admitted she had an outstanding student loan. However, she testified she was unaware she had been delinquent since 1989. She stated she first became aware of it in February of 1991 when the company contacted her parents' home. At this time, she made arrangements to start repaying.

Lawrence testified she began packing for her move in February and there were about 10 packing boxes around the apartment when Atkins visited. There were clothes on the bed but the place was not in disarray. There were no dishes in the sink because they were packed, there was no garbage on the floor, and no odor of cat.

Thomas Forran was the bookkeeper for Lawrence's former residence in March of 1991 and delivered five-day notices on tenants. He served Shawn Williams with a five-day notice on March 7; however, he had no idea whether Lawrence ever saw it. According to Forran, it was because the rent was not paid in the amount of $316.

Lawrence denied ever being served with a summons of process to be evicted but admitted she and her former roommate owed $300 when she moved out which the security deposit would cover. Lawrence also denied being aware of any legal proceedings against her or Shawn Williams.

Shawn Williams testified he and Lawrence had a cat that was given to them by a friend in August or September of 1990. When he and Lawrence moved out of the apartment, they returned the cat to the friend.

In an offer of proof, Shawn Williams testified that Lawrence was a fairly messy person: the dishes were never cleaned, the cat got into the garbage, her clothes were thrown around her room, and she had food on the floor in her room.

He further testified they received a five-day notice at the begin-

ning of March that Lawrence was aware of. She was also home when the sheriff served them with legal process.

Finally, Shawn Williams testified he was aware of Lawrence's prior credit history. When they moved in together (February 1990), she expressed concern about it, stating it was fairly negative and she was unsure whether she would be able to rent an apartment. Based on this, she wanted him to get the apartment on his credit alone. She told him about the student loan and other bills. He saw her credit report in April of 1990, which was several pages in length and had the student loan on it. According to Shawn Williams, Lawrence told him she made $26,000 per year, then said $18,000, then said $23,000.

Lawrence filed a complaint for discrimination on March 12, 1991, based on being single, black, and/or female. When she filed the complaint, she believed she was discriminated against based on Atkins' request to view her apartment and the fact he never gave reasons for rejecting her. According to Lawrence, her only conclusion was that she was rejected either because of her race, sex, or marital status.

The Commission found Lawrence established a *prima facie* case of discrimination. It then extensively detailed and analyzed each of Atkins' reasons for rejecting Lawrence, noting that at the hearing he gave at least six reasons but gave Ms. Williams only two and Biazar none. The Commission found most of Atkins' substantive testimony incredible and totally unbelievable and in several instances specifically detailed what testimony it disbelieved or found false and why.

As to the cat, the Commission found that although Atkins had a no-pet policy, this was not his reason for rejecting Lawrence. It further found Lawrence did not own the cat. According to the Commission, Atkins falsely testified he spoke to Lawrence after the initial meeting and created the conversation with Lawrence in which she admitted ownership of the cat.

As to Lawrence's apartment being messy, the Commission totally disbelieved Atkins' and Mr. Williams' testimony. It found this reason without basis and any reliance on the inspection pretextual.

As to Lawrence's poor credit history or outstanding student loan, the Commission noted there was nothing in the credit report generated by Biazar about the student loan. There was also no other credible evidence presented that Atkins was aware of the loan. In addition, Atkins admitted he did not have a second credit report.

"[Atkins] falsely testified *** that prior to rejecting Complainant for the Apartment he had contacted a friend of his to get information about the Complainant's credit history. *** Respondent falsely testified that 'one of the big reasons' for rejecting Complainant was her credit, which was 'just terrible.' [Citation.] Respon-

dent falsely testified that among the reasons he gave to Karen Biazar for rejecting Complainant was that Complainant had an outstanding student loan [citation] and that he had learned Complainant had an outstanding student loan on March 5th or 6th. [Citation.] The Commission finds that Respondent was not aware of the student loan when he rejected Complainant, since it was not listed on the TRW credit report. *** Therefore, the Commission finds that the Respondent did not reject Complaint[ant] as a tenant because of any problem she had with her credit or because of her outstanding student loan and that Respondent's reliance on this reason for rejecting Complainant as a tenant was pretextual."

Similarly, the Commission disbelieved Atkins' testimony that he checked on Lawrence's employment and found that Mr. Williams' testimony regarding Lawrence's annual earnings was not credible.

As to the fact rent was owing, the Commission found it unlikely Atkins knew of this prior to rejecting Lawrence. Therefore, Atkins' reliance on this was pretextual.

Ultimately, the Commission found Atkins created testimony and falsely testified concerning what he knew at the time he made his decision and that "but for Complainant's race, she would not have been rejected as a tenant." It found that any investigation Atkins did was after Lawrence filed her complaint with the Commission. In summation, the Commission found "both that the Complainant established intentional discrimination *and* that Respondent's alleged non-discriminatory reasons were not worthy of credence." (Emphasis in original.) "[B]ut for her race she would not have been rejected as a tenant when the decision was made by the Respondent *with the information then available to him.*" (Emphasis in original.) It awarded Lawrence $500 in damages, attorney fees in the amount of $4,935, and assessed a fine against Atkins of $300.

## II. ANALYSIS

### A. MANIFEST WEIGHT OF THE EVIDENCE

Atkins first contends there was no evidence presented to support a finding that Lawrence was qualified to rent the apartment. According to Atkins, the credit reports showed Lawrence was delinquent on a student loan, which she admitted, there were other blemishes on her credit report, and she had a rent problem with her previous landlord. In addition, he argues there were other credible reasons to deny her application: her messy apartment and the fact she owned a cat and Atkins had a no-pet policy.

As the Commission noted, there is no Illinois reported case law

on the burden of proof and requisite elements of a suit under the ordinance. Nonetheless, the ordinance is similar to the Illinois Human Rights Act (the Act) (775 ILCS 5/1—101 *et seq.* (West 1994)) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000a *et seq.* (1994)) and espouses the same purpose. Thus, as Illinois courts have routinely done, we can rely upon federal law in interpreting and determining whether discrimination has occurred. *Pioneer Life Insurance Co. v. Woodard*, 152 Ill. App. 3d 236, 242 (1987). See also *Turner v. Human Rights Comm'n*, 177 Ill. App. 3d 476, 486 (1988) (in interpreting Act, court can look to federal interpretation of Fair Housing Act (42 U.S.C. § 3601 *et seq.* (1994))).

■ A *prima facie* case of housing discrimination includes proof that: "(1) complainant belong[s] to a minority; (2) respondent [was] aware of it; (3) complainant [was] ready and able to accept respondent's offer to rent; and (4) respondent refuse[d] to deal with complainant." *Hsu v. Human Rights Comm'n*, 180 Ill. App. 3d 949, 953 (1989). Once a complainant establishes these elements, the burden shifts to the respondent to "show a legitimate reason for refusing to deal with the complainant." *Hsu*, 180 Ill. App. 3d at 954. The complainant then must show the reason is pretextual, *e.g.*, either that a discriminatory purpose more likely motivated respondent's decision or that respondent's reason is unworthy of belief. *Hsu*, 180 Ill. App. 3d at 954. See also *Turner*, 177 Ill. App. 3d at 488-89; *Kane v. Oak Trust & Savings Bank*, No. 93 C 1708 (N.D. Ill. November 16, 1995).

■ In reviewing administrative decisions:

> "[T]his court should not reweigh the evidence, assess the credibility of witnesses, or review the ALJ's findings, but rather must ascertain whether the final decision of the administrative agency, such as the Commission here, is against the manifest weight of the evidence. [Citations.] For this court to overturn the Commission's decision as contrary to the manifest weight of the evidence, an opposite conclusion must be clearly evident or the decision palpably erroneous. [Citation.] If the record contains any evidence to support the agency's decision, that decision must be upheld." *Hsu*, 180 Ill. App. 3d at 953.

■ In this case, the sole element in dispute is whether Lawrence was qualified to rent Atkins' apartment based on the information available to him at the time he made the decision to reject Lawrence.

The only evidence in the record of Lawrence's credit history at the time Atkins made his decision was Lawrence's application and the credit report generated by Biazar. The application showed Lawrence had worked at City Colleges of Chicago for $1^1/2$ years, earning

a salary of $26,000, that her current monthly rent was $1,200, and that she had savings and checking accounts with Citibank. The credit report showed three accounts in good standing, no delinquencies, and a total outstanding debt of $275.

The Commission was free to disbelieve Atkins' testimony that he had a second credit report or other information when he made his decision. *Kane*, slip. op. at _____ ("court may disbelieve reasons proffered by a defendant to show that he acted without discriminatory intent"). As to the second credit report, Atkins admitted he did not have this report when he made his decision to reject Lawrence.

Atkins testified he had other information regarding Lawrence's outstanding loan, outstanding rent, and employment at the time he rejected her. As to the outstanding student loan, there was no evidence Lawrence included this information on her application nor was there any evidence Biazar was aware of it and communicated it to Atkins. Lawrence did not testify she told Biazar of it, and Biazar did not testify she told Atkins about the loan. The only testimony offered was from Atkins and his testimony was conflicting. He testified at the initial hearing he was aware of the outstanding student loan when he viewed Lawrence's apartment because it was reflected in information he had received from another source, Mr. Meyer. He then stated there was also an item of concern on the credit report he received from Biazar. However, this report contains no adverse credit information. Following the initial hearing, Atkins' counsel forwarded a letter to Lawrence's counsel stating Atkins had information about Lawrence's credit history but not from Meyer but instead from Biazar or Bernie Rosenfeld. At the second hearing, Atkins testified he thought he had received a second credit report, but stated he was wrong. He stated he had other information, including information from Biazar, that Lawrence had an outstanding student loan that she told him about on March 5 or 6. According to Atkins, Biazar told him Lawrence had three lines of good credit, an outstanding student loan, and outstanding rent owed to her landlord. Biazar did not confirm this testimony. The only evidence presented was that of Atkins, which the Commission disbelieved.

As to the past-due rent, again only Atkins stated he had this information. Biazar had not yet received this information and, therefore, had not supplied it to Atkins. Moreover, Forran denied speaking with Atkins or at the least could not remember doing so. Additionally, there is no evidence Atkins spoke with Mr. Williams to find out this information. Again, Atkins' own testimony was contradictory. He testified Biazar told him about the outstanding rent and said it was only minor. He stated he received this information when

he spoke to Biazar on Saturday, March 9, the day after he viewed Lawrence's apartment. However, earlier in his testimony, he stated Biazar told him this information on March 5 or 6.

As to Lawrence's salary, the Commission was also free to discredit Atkins' testimony that he researched Lawrence's employment. It was likewise free to disbelieve Mr. Williams' testimony regarding Lawrence's salary.

Based on the evidence in the record, the Commission's decision finding that Lawrence met her burden of proving a *prima facie* case was not against the manifest weight of the evidence. Similarly, the finding that she met her burden of demonstrating Atkins' reasons were pretextual was not against the manifest weight of the evidence, particularly where the Commission found a majority of Atkins' testimony unworthy of belief.

As a side note, Atkins argues he had other valid reasons for rejecting Lawrence, *e.g.*, the messy apartment and the cat. As to the messy apartment, the Commission was free to disbelieve Atkins' and Mr. Williams' testimony. As to the cat, the Commission found Lawrence did not own a cat and, if she did, Atkins did not offer her a chance to get rid of it, as he had done with another tenant.

Based on the evidence before the Commission and its duty to resolve conflicting testimony and draw reasonable inferences, we cannot say its decision is against the manifest weight of the evidence.

## B. AWARD OF ATTORNEY FEES UNDER ORDINANCE

Atkins next contends that no state statute authorizes payment of attorney fees in cases such as this and, thus, the ordinance authorizing fees is invalid.

The relevant statutory language in the Act states:

> "A political subdivision, or two or more political subdivisions acting jointly, may create a local department or commission as it or they see fit to promote the purposes of this Act and to secure for all individuals within the jurisdiction of the political subdivision or subdivisions freedom from unlawful discrimination ***. The provisions of any ordinance enacted by any municipality or county which prohibits broader or different categories of discrimination than are prohibited by this Act are not invalidated or affected by this Act." 775 ILCS 5/7—108(A) (West 1994).

Remedies available under the Act that specifically relate to discrimination in real estate transactions include actual damages (775 ILCS 5/8B—104(B) (West 1994)), a civil penalty (775 ILCS 5/8B—104(C) (West 1994)), attorney fees and costs (775 ILCS 5/8B—104(D) (West 1994)), and anything else that will make the complainant whole (775 ILCS 5/8B—104(G) (West 1994)). Paragraph (D) states:

"Pay to the complainant [after a finding of a civil rights violation] all or a portion of the costs of maintaining the action, including reasonable attorneys fees and expert witness fees incurred in maintaining this action before the Department, the Commission and in any judicial review and judicial enforcement proceedings." 775 ILCS 5/8B—104(D) (West 1994).

In statutory construction:

"[W]e must focus on the language of the statute itself. [Citation.] Legislative intent is the controlling inquiry in construing a statute, and the statutory language is the best indication of that intent. [Citation.] Statutory provisions must be read as a whole, and no word or paragraph should be interpreted so as to be rendered meaningless." *Boaden v. Department of Law Enforcement*, 267 Ill. App. 3d 645, 651 (1994), *aff'd*, 171 Ill. 2d 230 (1996).

We also cannot read words into a statute that are not there. *Illinois Wood Energy Partners, L.P. v. County of Cook*, 281 Ill. App. 3d 841 (1995).

■ It seems evident that the Act seeks to give political subdivisions the same powers held by the state commission. First, the Act provides a remedy of attorney fees in suits based on discrimination in real estate transactions. It also provides that local municipalities may set up their own commissions to promote the purpose of the Act. One purpose of the Act would logically include remedying the evil done by discrimination, *i.e.*, awarding damages, including attorney fees, to the victim. The provision that provides for attorney fees in state matters does not limit that remedy by denying or restricting the same right to local matters. Moreover, in the provision giving local municipalities authority to act, the Act does not limit their authority. In particular, the Act does not deny the local commission authority to assess attorney fees. Finally, the Act provides for concurrent jurisdiction between the state commission and a local commission. Paragraph (B) states: "When the Department and a local department or commission have concurrent jurisdiction over a complaint, either may transfer the complaint to the other under regulations established by the Department." 775 ILCS 5/7—108(B) (West 1994). Based on the fact the Act gives local municipalities authority to set up a commission and also recognizes that the local commission may have concurrent jurisdiction with the state commission, it is illogical to conclude that a local commission could not award attorney fees. Take the case where a complainant files a complaint with the state commission where he or she would be entitled to attorney fees should he or she prevail. Assume the state commission transfers the cause to a local commission. It is absurd to find that this individual would

now not be able to recover attorney fees simply because the state commission transferred the case to a local commission and did not render the decision.

Based on the language and the purpose behind the statute, we find that the legislature intended to give local commissions the ability to award attorney fees to successful complainants.

## C. RIGHT TO A JURY TRIAL IN HUMAN RIGHTS CASES

Atkins' third contention is that the city ordinance violates his right to jury trial (Ill. Const. 1970, art. I, § 13), separation of powers (Ill. Const. 1970, art. II, § 1) and the independence of the judiciary (Ill. Const. 1970, art. VI, § 1) under the Illinois Constitution. Atkins contends that compensatory damages are for the jury to decide, not the Commission, and two other states (Florida and California) have found similar statutes violative of these rights. Atkins presents no argument or authority to support his contentions regarding separation of powers or independence of the judiciary.

■ The right to a jury trial stems from the Illinois Constitution. It provides: "The right of trial by jury as heretofore enjoyed shall remain inviolate." Ill. Const. 1970, art. I, § 13. This provision is identical to the provision contained in the Illinois Constitution of 1870 and has been interpreted to afford the right to a jury trial only as it existed at common law. *Lloyd A. Fry Roofing Co. v. Pollution Control Board*, 20 Ill. App. 3d 301, 310 (1974).

In *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33 (1994), the court extensively discussed the right to a jury trial and the limits placed on that right by the Illinois Constitution:

"[O]ur constitution does not guarantee the right to a jury trial in any action nonexistent at common law, even if such action is legal in nature:

'The constitutional provision that "the right of trial by jury has heretofore enjoyed shall remain inviolate," means that the right to a jury trial shall continue in all cases where such right existed at common law at the time the constitution was adopted, *but that constitutional provision has never been held to prohibit the legislature from creating new rights unknown to the common law and provide for their determination without a jury.* [Citation.]' (Emphasis added.) (*Standidge v. Chicago Rys. Co.* (1912), 254 Ill. 524, 532.)

Moreover, ' "[t]he constitutional provision *** was not intended to guarantee trial by jury in special or statutory proceedings unknown to the common law." ' *People ex rel. Keith v. Keith* (1967), 38 Ill. 2d 405, 408, quoting *People v. Niesman* (1934), 356 Ill. 322, 327." *Martin*, 163 Ill. 2d at 72-73.

In fact, the right to a jury trial "only attaches in those actions where such right existed under the English common law at the time the constitution was adopted." *Martin*, 163 Ill. 2d at 73-74. An action under the Act is a departure from the common law (*Lipsey v. Human Rights Comm'n*, 267 Ill. App. 3d 980, 985 (1994); *Parsons v. National R.R. Passenger Corp.*, 259 Ill. App. 3d 85, 88 (1994)) and, therefore, an action under the ordinance surely must be a departure. Thus, because an action under this ordinance is a newly created statutory right, Atkins is not entitled to a trial by jury. In addition, the ordinance itself (and the Act) does not provide for jury trials. It is evident from the language that the drafters intended this action to be tried before the Commission without a jury.

## D. EXCLUSION OF EVIDENCE BY THE COMMISSION

■ Finally, Atkins contends that the Commission committed reversible error by excluding evidence regarding damage done by a cat in one of his apartments. According to Atkins, the evidence was probative of his no-pet policy and critical to an issue in the case, *e.g.*, why he denied Lawrence's application.

This contention is without merit. There was testimony Atkins had a no-pet policy and the Commission found he maintained such a policy. However, the Commission also found Lawrence did not own a cat and, even if she did, Atkins did not provide her a chance to get rid of the cat before rejecting her. This finding is amply supported by the evidence. Therefore, there was no reversible error in excluding this evidence.

## III. CONCLUSION

For the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA and EGAN, JJ., concur.