CHRISTIANA M. POWELL, Plaintiff-Appellant, v. THE CITY OF CHICAGO HUMAN RIGHTS COMMISSION *et al.*, Defendants-Appellees.

First District (2nd Division)    No. 1—08—0752

Opinion filed March 17, 2009.

46

Michael D. Gerstein, of Des Plaines (Myles Glasgow, of counsel), for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellees.

PRESIDING JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiff Christiana M. Powell filed an employment discrimination complaint with the City of Chicago Commission on Human Relations (the commission). She alleged her former employer, the Chicago Transit Authority (the CTA), and department manager, Omar Colon (Colon), discriminated against her on the basis of her sexual orientation in violation of the City of Chicago Human Rights Ordinance (ordinance) of the Chicago Municipal Code (Chicago Municipal Code §2—160—010 et seq. (2006)). The commission dismissed her complaint for lack of substantial evidence and denied her request for review. The circuit court affirmed the commission and dismissed plaintiff's petition for common law writ of certiorari. Plaintiff appeals, arguing the court erred in affirming the commission because the commission dismissed her complaint without first conducting a reasonable investigation into her charges. We affirm.

## Background

Plaintiff, a lesbian, was employed by the CTA from August 1987 to July 3, 2002, when the CTA terminated her employment as a clerk in the legal department for excessive absenteeism. On December 30, 2002, plaintiff filed a complaint with the commission, alleging the

CTA and Colon (collectively the CTA) subjected her to differential treatment and sexual preference discrimination in violation of section 2—160—030 of the ordinance (Chicago Municipal Code §2—160—030 (amended November 6, 2002)) because she took time off from work to care for her life partner, Cuppie Webb, during Webb's treatment for breast cancer. Plaintiff stated she had taken time off from work in the form of vacation and sick time and a leave of absence to care for Webb but was disciplined for excessive absenteeism. She alleged heterosexual married couples at the CTA are not subjected to the same terms and conditions she and her partner were subjected to and that the CTA's policy regarding leave of absence discriminates against gay employees like herself who have life partners with medical conditions.

The commission assigned an investigator to plaintiff's complaint. The investigator interviewed plaintiff and prepared a report of the interview. Plaintiff told the investigator that the CTA subjected her to different terms and conditions of employment based on her sexual orientation because, although the CTA had a policy permitting employees to carry their domestic partners on their insurance plans, the CTA did not have procedures in place to support the policy.

Plaintiff stated she added Webb to her insurance policy in August 2000. In May 2001, Webb was diagnosed with breast cancer. Webb underwent surgeries and received chemotherapy treatments. Plaintiff initially used personal leave to attend to Webb but, when she learned Webb would need additional surgery, told her supervisor, Michele Cash (Cash), and Colon that she would need to miss work to attend to Webb periodically. She provided them with a calendar of the dates she would be absent in order to accompany Webb to her treatments. Plaintiff occasionally missed work on short notice if Webb reacted poorly to the chemotherapy. Plaintiff stated that even though her absences from work resulted from Webb's chemotherapy and its side effects, Colon began to discipline her for her time away, knowing she had applied for and been denied leave pursuant to the Family and Medical Leave Act (FMLA) (29 U.S.C. §2601 *et seq.* (2006)) to care for Webb.

Plaintiff told the investigator that Colon issued her a "caution and instruct" notice on October 17, 2001, for three unexcused absences. On February 27, 2002, he issued her a written warning for two additional unexcused absences, one for an absence on October 29, 2001, and another for the period from December 21, 2001, to January 31, 2002. Plaintiff stated the October 29 absence was due to her need to care for Webb and, when she called Colon and Cash to let them know she would not be in, neither informed her that her absence would be unexcused that day or that Webb-related absences would be unexcused. The second absence, lasting 28 work days, was due to a back problem

plaintiff suffered. Plaintiff told the investigator that she called Cash and Colon and told them she needed time off due to her back problem but neither told her the absence would be unexcused. She provided medical documentation of her problem to the CTA's medical department but not to Colon or Cash. She was absent with the back problem until February 20, 2002.

Plaintiff stated Colon submitted plaintiff to a "corrective case interview" in May 2002 for two additional unexcused absences. The first absence was on April 29, 2002, when she needed to care for Webb and the second was on May 15, 2002, and was due to her own illness. During the corrective case interview, Colon placed plaintiff on a six-month probation period. During the probation period, if plaintiff incurred a single attendance-related incident, she would be subject to further discipline, including discharge. On July 2, 2002, Colon terminated plaintiff's employment as a result of a tardy incurred when she arrived at work late on June 20, 2002. Plaintiff stated she overslept that morning and came to work after noon because the two supervisors she called to request a random vacation day denied her request and ordered her to come to work. As a result of the tardy, Colon recommended she be terminated.

Without stating specifics, plaintiff told the investigator she was subjected to greater scrutiny than non-gay employees, a coworker had been told to inform Colon whenever plaintiff left her desk and another coworker had warned her the CTA was out to get her.

The commission requested plaintiff to produce documents or information listing each incident in which she felt more closely monitored than non-gay employees, including dates, descriptions, witnesses to the incidents and what it was about the incident that led her to believe she was treated differently based on her sexual orientation. It requested similar information regarding the incident in which someone reported to her that Colon told the person to inform him whenever plaintiff stepped out and the names of the employees she described as warning her that the CTA was out to get her.

Plaintiff's response disclosed eight witnesses, including Cash, to a September 8, 2000, incident in which Cash personally invited each female in the department to lunch, except plaintiff, skipping over plaintiff and going on to invite the next employee.

She disclosed 10 witnesses, including Cash and Colon, to several incidents in August 2000 in which Cash allegedly singled her out from her coworkers. She stated Cash called her into Cash's office and told her she wanted plaintiff's attitude to change, plaintiff was away from her desk too often and plaintiff's coworkers felt she was angry with them. A few days later, Cash called her in again and told her that dis-

sension in the department was due to plaintiff's attitude and suggested plaintiff "change back." Plaintiff identified a fellow employee who called her at home that night to let her know that Cash told the employee to keep plaintiff out of the employee's office because plaintiff did not have time to be anywhere but her desk.

Plaintiff stated that Cash called plaintiff into her office again a few days later, "in a loud voice," and told her she was on CTA time from 8 a.m. to 4:30 p.m., she should be at her desk working at 8 a.m. and Cash did not want to catch plaintiff doing anything other than her work. Later that day, Cash asked her whether she had received an e-mail and, upon being told plaintiff had just read it, ordered plaintiff "in a loud, boisterous tone *** in front of the entire office" to get her union representative and meet Cash in her office because Cash was "sick of this." Cash issued plaintiff a "caution and instruct" notice for poor work performance and excessive leave from her work location. Cash informed plaintiff that she was to stay at her desk from 8 a.m. to 4:30 p.m. and was not to leave her desk without telling Cash exactly where she was going, whether it be to the washroom or doing work. In April 2001, Cash told plaintiff that Colon had instructed Cash to create an attendance sheet tracking plaintiff and her whereabouts. Plaintiff identified the employee who had told her Cash had told him to "keep tabs" on plaintiff whenever she left her desk and to inform Cash when she left her desk. He had warned plaintiff to "watch [her] back" and "[t]hese people are after you and they want you bad."

Plaintiff also described a meeting in which she met with Colon, Cash, the manager of employee relations, her union representative and the vice president of her union local regarding the CTA's domestic partners policy, the lack of procedures for implementing it and denial of her request for FMLA. She stated that, after the October 2001 disciplinary meeting in which she received the caution and instruct notice, her union vice president and union representative warned her "they [management]" were "starting the process to get rid of her" and to "[b]e very careful." After the May 24, 2002, disciplinary meeting in which she was placed on probation, her union representative warned her that "they [management]" wanted to fire her and were "going to use any little thing to get" her and the probation was "so stringent, until they can fire [her] for anything."

In response to plaintiff's complaint, the CTA submitted a position statement denying it disciplined plaintiff or treated her differently because of her sexual orientation. It asserted it terminated plaintiff's employment after a lengthy disciplinary process to turn her attendance around and plaintiff failed to avail herself of opportunities to improve her work record. It attached evidence to show that during the period

from January 22, 2001, to January 21, 2002, plaintiff had 40 sick days, 12 weeks of FMLA leave, 24 vacation and floater days, 13 leave of absence days and 22 hours of miscellaneous time off. She worked a total of 1,064.50 hours during this period. Her FMLA expired on December 20, 2001. She did not qualify for additional FMLA because she did not work at least 1,250 hours during the previous 12 months as required by the FMLA.

The CTA's evidence showed that in the 12 months prior to plaintiff's discharge, from July 1, 2001, through June 30, 2002, plaintiff worked 1,109.25 hours out of a possible 2,080 hours. In only two pay periods did plaintiff work the full 80 hours. During this 12-month period, plaintiff had 34 days lost, 7 sick entries and 1 tardy, in addition to excused absences. One excused absence was a 17-day leave of absence granted to plaintiff in August 2001 to care for Webb. After exhausting all her vacation, sick and personal days caring for Webb, she had explained her domestic situation to Cash and requested additional time off. Cash recommended her leave be approved.

The CTA submitted records showing plaintiff's absenteeism had such a negative impact on her department that her job had to be filled by another employee for the last month of her extended absence due to back injury because the department could not function efficiently with a constantly absent clerk. The CTA asserted it disciplined and terminated plaintiff according to the standard disciplinary procedures it applied to every employee, issuing first a caution and instruct warning, then a written warning, then a corrective case interview and, upon breach of probation, termination.

On May 9, 2006, the commission dismissed plaintiff's case, finding "no substantial evidence of the alleged violation." The investigation summary attached to the dismissal order outlined in detail plaintiff's argument and evidence; the CTA's position and evidence; and the documents examined, including notes from Webb's doctor stating that plaintiff was Webb's primary caregiver and attended Webb's medical treatments, plaintiff's attendance and absenteeism records, disciplinary documents issued to plaintiff, an October 2001 memo from Colon to the CTA's legal counsel requesting guidance as to whether plaintiff could be granted a leave of absence pursuant to the FMLA and the July 2002, notice of discharge issued to plaintiff.

The report states that the investigation revealed the CTA accommodated plaintiff in that it granted her a 17-day leave of absence in August 2001 when she needed to care for Webb and, from January 22, 2001, to January 21, 2002, allowed her to use 40 sick days, 12 weeks of FMLA (for reasons unrelated to Webb's illness), 24 floating vacation days, 13 leave of absence days and 22 days of miscellaneous leave, for

a total of 1,015 work hours of a possible 2,080 work hours during that 12-month period. The investigator found, because plaintiff only worked 1,015 hours in 2001, she was not entitled to FMLA in 2002 and thus was subject to ordinary leave procedures, which the CTA followed in conducting its disciplinary process of plaintiff.[1]

The investigator found no evidence the CTA treated other employees more favorably under similar circumstances. She found no evidence that plaintiff's daily activities were more closely monitored than other non-gay employees because, while plaintiff submitted no evidence to support that allegation, the CTA submitted evidence that plaintiff's evidence was more closely monitored when her absenteeism continued. The report stated the investigation did not reveal that the CTA's decisions regarding plaintiff's employment were based on plaintiff's sexual orientation or that similarly situated employees who were not lesbians were treated more favorably than plaintiff. It noted that an employer is not obligated to retain an employee who does not regularly report to work. Based on the report, the commission found no substantial evidence of discrimination based on plaintiff's sexual orientation and dismissed her complaint.

Plaintiff filed a request for review by the commission of its decision dismissing her complaint. She argued that the commission failed to conduct a thorough investigation because it failed to interview the 14 witnesses she proposed; it failed to investigate the CTA's termination records pertaining to other discharged employees to determine whether there was evidence of disparate treatment based on sexual orientation; it made impermissible credibility determinations; and there was substantial evidence of a pretextual excuse by the CTA for its treatment of plaintiff.

On July 13, 2006, the commission denied plaintiff's request for review. It found plaintiff did not support her burden of either presenting sufficient evidence to support the elements of her claim or provide the commission with information directing it to evidence which it could obtain using its investigatory powers and which would be reasonably likely to lead to a substantial evidence finding. It stated it performed a detailed analysis of plaintiff's evidence and its inadequacy in supporting her claim, in providing direction to the commission or in showing the CTA's response was pretextual. The commission stated it

---

[1]The investigator states plaintiff worked 1,015 hours during this period. The CTA's attendance records show she worked slightly more hours: 1,064.50. She was absent from work for 1,015 hours. However, the error in the investigator's report is of no consequence because, whether she worked 1,064.50 hours or 1,015 hours, plaintiff did not work the 1,250 hours required to qualify for FMLA.

"is not required to *search out* evidence to prove a complainant's case or a respondent's defense[,] *** to interview every witness or check out every avenue of inquiry that a complainant or respondent might propose[,] *** [or] to audit a respondent's records in the hope of finding a pattern of disparate treatment or disparate impact." (Emphasis in original.)

The commission reaffirmed its finding of no substantial evidence.

On August 15, 2006, plaintiff filed a complaint for administrative review of the commission's decision with the circuit court. On February 22, 2008, the court affirmed the commission's dismissal of plaintiff's action and its denial of her request for review of the dismissal. Plaintiff timely appeals.

## Analysis

### Standard of Review

The ordinance provides that "[n]o person shall directly or indirectly discriminate against any individual in *** discharge, discipline, *** or other term or condition of employment because of the individual's race, color, sex, *** [or] sexual orientation." Chicago Municipal Code §2—160—030 (amended November 6, 2002). In order to enforce the city's nondiscrimination policy, the city empowered the commission to receive and investigate complaints of violations of the ordinance. Chicago Municipal Code §2—160—090 (amended March 21, 1990). Upon receipt of a complaint, the commission must investigate the complaint to determine "whether there is substantial evidence that a violation of [the ordinance] has occurred." Chicago Municipal Code §2—120—510(f) (amended July 8, 1998). If it finds substantial evidence that a violation occurred, it is to conduct a hearing on the complaint. Chicago Municipal Code §2—120—510(g) (amended July 8, 1998). If it finds no substantial evidence that a violation occurred, as happened here, it will dismiss the complaint.

In determining employment discrimination cases under the ordinance, we look to analogous cases arising under the Illinois Human Rights Act (the Act) (775 ILCS 5/1—101 *et seq.* (West 2006)) and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000a *et seq.* (1994)).[2] *Atkins v. City of Chicago Comm'n on Human Relations ex rel. Lawrence*, 281 Ill. App. 3d 1066, 1074, 667 N.E.2d 664, 668 (1996).

---

[2]The Illinois Human Rights Act espouses the same purpose as the ordinance, providing that it is unlawful "[f]or any employer *** to act with respect to *** discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." 775 ILCS 5/2—102(A) (West 2006). It defines "unlawful discrimination" as "discrimination against a person because of his or her *** sexual orientation." 775 ILCS 5/1—103(Q) (West 2006).

■ In analyzing employment discrimination cases under the Act, we use the three-part analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178, 545 N.E.2d 684, 687 (1989). First, a plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination, thereby raising the rebuttable presumption that the employer unlawfully discriminated against the plaintiff. *Zaderaka*, 131 Ill. 2d at 178-79, 545 N.E.2d at 687. In order to present a *prima facie* case, the complainant must show that: (1) she is a member of a protected class; (2) she was performing satisfactorily; (3) she was discharged despite the adequacy of her work; and (4) a similarly situated employee who was not a member of the protected group was not discharged. *Owens v. Department of Human Rights*, 356 Ill. App. 3d 46, 52, 826 N.E.2d 539, 544 (2005).

Then, to rebut the presumption, the employer must articulate, but not prove, a legitimate nondiscriminatory reason for its decision. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687. Lastly, if the employer carries its burden of production, the presumption of unlawful discrimination falls and the plaintiff must prove by a preponderance of the evidence that the reason articulated by the employer was not its true reason but, rather, a pretext for unlawful discrimination. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687. The ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against the plaintiff rests at all times with the plaintiff. *Zaderaka*, 131 Ill. 2d at 179, 545 N.E.2d at 687.

Plaintiff does not argue that there is substantial evidence in the record showing that the CTA treated a similarly situated heterosexual employee more favorably than it treated her or that the CTA's reasons for its treatment of her are pretextual excuses to cover up discrimination. Instead, her argument is directed to asserting that the reason for the lack of substantial evidence supporting her discrimination claim is the commission's failure to conduct an adequate, reasonable investigation of her complaint. She asserts, as she did in her request for review, that the investigator should have interviewed the witnesses she identified; should have searched or ordered the CTA to search the CTA's records pertaining to other discharged employees to determine whether there was evidence of disparate treatment; should not have made impermissible credibility determinations; should have asked plaintiff better questions during the interview; and should not have ignored substantial evidence of a pretextual excuse by the CTA for its treatment of plaintiff.

Upon a final decision by the commission, a complainant may seek

judicial review thereof by filing a petition for a writ of *certiorari* in the chancery division of the circuit court. City of Chicago Commission on Human Relations, Regulation 250.150 (2008); *Godinez v. Sullivan-Lackey*, 352 Ill. App. 3d 87, 89, 815 N.E.2d 822, 825 (2004).[3] On appellate review, we consider the administrative agency's decision and not that of the circuit court. *Godinez*, 352 Ill. App. 3d at 90, 815 N.E.2d at 825. We hold the agency's findings and conclusions on questions of fact to be *prima facie* true and correct and will not overturn an administrative decision unless the agency exercised its authority in an arbitrary or capricious manner or its decision is against the manifest weight of the evidence. *Godinez*, 352 Ill. App. 3d at 90, 815 N.E.2d at 825. If the record contains any evidence to support the agency's decision, we must uphold the decision. *Atkins v. City of Chicago Comm'n on Human Relations ex rel. Lawrence*, 281 Ill. App. 3d 1066, 1074, 667 N.E.2d 664, 669 (1996). We do not accord the same deference to questions of law and review such *de novo*. *Godinez*, 352 Ill. App. 3d at 90, 815 N.E.2d at 826.

Plaintiff asserts the principal question here, whether the commission met its obligation under the ordinance to conduct an adequate investigation of plaintiff's complaint, is one of law and we should, therefore, review the case *de novo*. The ordinance does not provide that the commission must perform an "adequate" or "reasonable" investigation, but it is a logical inference that any investigation required should be adequately and reasonably performed. The ordinance does not define an "investigation," what its scope should be or how much effort the commission should expend on an investigation, and plaintiff is correct that there is no case law addressing what constitutes an adequate investigation. But this is because it is a question of fact dependent on the circumstances of each case, not of law.

■ It is the commission, on a request for review of a dismissal for lack of substantial evidence, which determines the sufficiency of an investigation. See *Kalush v. Department of Human Rights Chief Legal Counsel*, 298 Ill. App. 3d 980, 989 n.4, 700 N.E.2d 132, 139 n.4 (1998) (court addressed adequacy of Illinois Department of Human Rights' investigation and dismissal of employment disrimination charge under

---

[3]Plaintiff filed a "complaint for administrative review" with the chancery division rather than a petition for writ of *certiorari*. However, her pleading makes clear that she is requesting judicial review of the commission's decision dismissing her complaint and denying her request for review and the incorrect title of her pleading does not affect the court's jurisdiction. *Nowicki v. Evanston Fair Housing Review Board*, 62 Ill. 2d 11, 15, 338 N.E.2d 186, 188 (1975) ("[l]abels have long since lost their significance in determining the legal sufficiency of a complaint in an ordinary action at law or in equity").

the Act and chief legal counsel's failure to further investigate dismissal upon request for review). Upon denial of a request for review, the commission implicitly finds, at a minimum, that the investigation finding lack of substantial evidence was sufficient. See *Kalush*, 298 Ill. App. 3d at 990-91, 700 N.E.2d at 139. In this case, the commission did more than implicitly find that the investigation was adequate. It found so explicitly, based on the facts surrounding the investigation. It addressed each of plaintiff's arguments in detail and explained why, given the paucity of information plaintiff gave to the investigator in support of her claim, the investigation was adequate, there was no substantial evidence of a violation and the complaint was properly dismissed. This is a factual determination and we, therefore, review it under the manifest weight of the evidence standard.

## Lack of Substantial Evidence

■ The record clearly supports the commission's determination that there was no substantial evidence that the CTA subjected plaintiff to different terms and conditions of employment based on her sexual orientation. The record shows plaintiff did not work enough hours to qualify for FMLA, her absenteeism was extensive and the CTA disciplined her according to its usual procedures applicable to employees with excessive absenteeism. Although there is ample evidence that the CTA disciplined plaintiff, there is nothing to show that the CTA exercised such discipline because she was a lesbian, that it would have treated plaintiff differently if she had been a heterosexual with excessive absenteeism. We will not belabor the meaning of "substantial evidence" because plaintiff does not argue the evidence was sufficient to meet that standard. The relevant question is whether the lack of substantial evidence is due to inadequate investigation by the commission, not whether there is substantial evidence in the record and the commission overlooked it.

## Adequacy of Investigation

■ Plaintiff does not need to prove her case at the complaint stage but she does need to present the commission with some modicum of specific evidence, with a direction in which to assert its investigative powers. As part of those powers, the commission can issue subpoenas for the appearance of witnesses and production of evidence, but only "if there is reason to believe that a violation has occurred and the testimony of the witness or the documents or items sought by the subpoena are relevant to the investigation." Chicago Municipal Code §2—120—510(k) (amended July 8, 1998). The record supports the commission's determination that plaintiff did not provide it with a reason to believe further investigation was warranted and that its investigation was reasonable under the circumstances.

The incidents plaintiff disclosed as reflective of how she was treated differently because of her lesbianism do not have any discriminatory overtones. The fact that her supervisor excluded her from a luncheon to which all other female employees were invited, monitored her coming and goings at the office and disciplined her for excessive absenteeism do not, without more, show discrimination on the basis of sexual orientation. Nor do her coworkers' warnings that the CTA wanted to fire her. Plaintiff was absent more than she worked. Much of her time away was excused, but a significant amount was not. She was granted significant amounts of leave but constantly requested more, called off on short notice or just did not come to work at all. Besides this, Cash, her supervisor, thought plaintiff created dissension while at work and was away from her desk too much. Plaintiff's own recitation of the incidents leading up to her termination contains no hint of discrimination based on her sexual orientation nor does she suggest how the witnesses she identified would confirm that her lesbianism was the basis for her treatment by the CTA. The information she disclosed as supporting her discrimination claim is not relative to how her sexual orientation impacted the CTA's treatment of her and the commission could reasonably find that no further investigation of this evidence was warranted.

The only evidence presented by plaintiff that is in any way relative to her claim is her showing that she was not granted additional leave under the FMLA to care for her lesbian partner, the CTA was not sure how to handle such requests from non-heterosexuals and the CTA did not start disciplining her until after it learned she was a lesbian and needed a 17-day leave of absence to care for her sick partner. But the CTA granted that 17-day leave of absence, with full knowledge that plaintiff was a lesbian, and it did not start disciplining her until after she accrued several unexcused absences over a two-month period.

The basis for plaintiff's complaint that the CTA discriminated against her appears to be the fact that she was a lesbian caring for a life partner rather than a heterosexual caring for a life partner. But she does not point to any heterosexual employee who was granted FMLA leave to care for a partner even though he/she did not work enough hours to qualify for FMLA leave or who was not disciplined or terminated despite similarly excessive absenteeism. A bald claim by plaintiff that she was treated differently is insufficient for the commission to investigate. It should not be expected to go on a "fishing expedition" to find support for plaintiff's claim.

Plaintiff asserts if the commission had asked her more pointed questions during the investigation she would have provided more

relevant information about her witnesses' testimony and would have provided additional evidence to buttress her claim of discrimination. But she had a chance to present that information during her request for review and failed to do so, arguing instead that she had no access to any relevant information because it was in the CTA's records. Granted, plaintiff has no access to the CTA's employment records and must rely on the commission to obtain information therefrom, to search those records or order the CTA to search those records for comparable heterosexual employees receiving more favorable treatment. But, after 13 years at the company, she can be presumed to be aware if such a case exists and to point the commission in the direction of that employee or employees, to provide a name, a department, a rumor, anything at all. She presented no such evidence.

It is not up to the CTA or the commission to support plaintiff's allegation of discrimination. The CTA provided a nondiscriminatory reason for its discipline and termination of plaintiff and evidence supporting that reason. With nothing to rebut but plaintiff's unsupported allegation that she was treated unfairly, the CTA provided evidence that it treated plaintiff according to the disciplinary procedures it applies to all employees who are chronically absent. It did not need to go beyond that at the investigation stage of plaintiff's claim. The commission did not need to go beyond interviewing plaintiff for details of her claim and requesting additional information relative to that claim when the information it received showed no discriminatory animus by the CTA. The evidence supports the commission's finding that the investigation was adequate and the lack of substantial evidence warrants dismissal of plaintiff's complaint.

For the reasons stated above, we affirm the decision of the circuit court.

Affirmed.

HOFFMAN and CUNNINGHAM, JJ., concur.