# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*1212 Restaurant Group, LLC v. Alexander*, 2011 IL App (1st) 100797

| | |
|---|---|
| Appellate Court Caption | 1212 RESTAURANT GROUP, LLC, d/b/a The State Room, RUSSELL SCALISE and SCOTT SCHWAB, Plaintiffs-Appellants, v. DEMETRI ALEXANDER and THE CITY OF CHICAGO COMMISSION ON HUMAN RELATIONS, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-0797 |
| Filed | September 29, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The appellate court affirmed the trial court's judgment upholding the findings and awards entered by the Chicago Commission on Human Relations on defendant's complaint alleging harassment and wrongful termination on the basis of his perceived sexual orientation, including the findings that although defendant was not terminated because of his perceived sexual orientation, he was subjected to harassment and a hostile work environment on that basis and the awards for emotional injury, punitive damages, and attorney fees and costs. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-16337; the Hon. William Maki, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Schiff & Hulbert, of Chicago (Matthew B. Schiff and Noah A. Frank, of counsel), for appellants. |
|---|---|
| | Strauss & Malk LLP, of Chicago (Brad S. Grayson and Kurt D. Hadley, of counsel), for appellee Demetri Alexander. |
| | Mara S. Georges, Corporation Counsel, of Chicago (Myriam Zreczny Kasper and Suzanne M. Loose, Assistant Corporation Counsel, of counsel), for appellee Chicago Commission on Human Relations. |
| Panel | JUSTICE STERBA delivered the judgment of the court, with opinion. Presiding Justice Lavin and Justice Pucinski concurred in the judgment and opinion. |

## OPINION

¶ 1      Defendant-appellee Demetri Alexander filed a complaint with the Chicago Commission on Human Relations (Commission) against plaintiffs-appellants Russell Scalise, Scott Schwab and the 1212 Restaurant Group (1212), alleging harassment and wrongful termination on the basis of, *inter alia*, perceived sexual orientation. Following a hearing on these claims, the Commission found that although Alexander was not terminated on the basis of perceived sexual orientation, he was subjected to harassment and a hostile work environment on that basis. The Commission awarded Alexander $35,000 in emotional injury damages, $140,000 in punitive damages, and $84,473.06 in attorney fees and costs. The circuit court upheld the Commission's findings and awards. On appeal, Scalise, Schwab and 1212 contend that the circuit court erred in finding that Alexander was subject to a hostile work environment because: (1) the relevant ordinance applies only to adverse employment actions, not hostile work environment claims; (2) Alexander lacked standing because he was not a member of a protected class; (3) 1212 was Alexander's only employer and, therefore, Scalise and Schwab had no duty to prevent the harassment; moreover, Scalise cannot be held liable for Schwab's actions; (4) the Commission improperly shifted the burden of proof; (5) the Commission reached clearly erroneous conclusions in assessing the credibility of the witnesses; (6) the Commission improperly concluded that occasional statements by Schwab constituted a hostile work environment; and (7) the Commission improperly concluded that Scalise participated in and had knowledge of the alleged harassment. Scalise, Schwab and 1212 further contend that the emotional injury award and the award of attorney fees and costs were arbitrary and capricious, and that the punitive damages award was an abuse of discretion. For the following reasons, we affirm the judgment of the circuit court.

-2-

¶ 2                                          BACKGROUND

¶ 3      In 1998, Alexander, a well-known Chicago restaurateur with approximately 35 years of experience in the restaurant industry, entered into a partnership with Richard Daniels to design and operate an elegant restaurant at 1212 North State Street in Chicago. Alexander and Daniels obtained a lease and began the build out of the restaurant but did not have sufficient funds to complete the project. They were subsequently introduced to Scalise, a commodities trader who wanted to invest in the project. Scalise agreed to provide the financing in exchange for an 85% ownership interest in the venture. Daniels retained a 15% ownership interest in the venture.

¶ 4      Scalise formed 1212, a limited liability company, and 1212 entered into an employment agreement with Alexander. Under the agreement, Alexander was to be employed as the "restaurant creative director and front house manager" for the restaurant. Alexander was entitled to base compensation, additional compensation tied to the restaurant's performance, and a minority ownership interest in the venture upon Scalise recouping his investment. The employment agreement provided that Alexander would report to Schwab as the designee of Scalise. Scalise orally agreed to give Schwab, a fellow commodities trader, a 5% minority ownership interest in the venture after Scalise recouped his investment.

¶ 5      During the build out of the restaurant, Alexander had various responsibilities which included: consulting with the architect, contractor and graphic designer; purchasing necessary items and equipment for the restaurant; and assisting in the hiring and training of restaurant staff. In July of 1999, a piece of heavy restaurant equipment was dropped on Alexander's foot, resulting in a severe crush injury which required Alexander to undergo multiple surgeries, walk with crutches and wear various special devices on his foot. The restaurant opened for business in April 2000. On June 12, 2000, Scalise terminated Alexander's employment with 1212.

¶ 6      On September 8, 2000, Alexander filed a complaint with the Commission against Scalise, Schwab and 1212, alleging harassment and wrongful termination on the basis of race, disability and perceived sexual orientation. The Commission did not find substantial evidence to sustain the disability claim, and Alexander did not present any evidence at the subsequent hearing on his claim that the alleged harassment was based on his opposition to race discrimination at the restaurant, leading the Commission to conclude that he had abandoned that claim.

¶ 7      A hearing on the complaint was held over a period of 6 days in July and August 2005. At the hearing, Alexander testified that during the course of his employment, Scalise and Schwab made offensive comments to him on a consistent basis, suggesting that he was homosexual. They called him names using derogatory terms for someone who is homosexual, and regularly accused him in graphic terms of engaging in homosexual acts with various individuals. The comments were made in front of restaurant staff, contractors, and, on some occasions, restaurant customers. Alexander testified that Schwab also left approximately 8 to 10 messages on his home answering machine over the course of a year, in which Schwab made similar comments and accusations.

¶ 8    Alexander testified that on nearly a daily basis, Schwab or Scalise called him "fag," "faggot," "queer," "sissy," "homo," and "dicksucker." Schwab also called him "Marybeth," and "buttercup." After the restaurant opened, Alexander was talking with some female customers at the restaurant's bar when Scalise walked over and said to him in front of the customers, "What are you talking to those girls for, you know you don't like girls, you know you just like to suck dick." On another occasion, Alexander asked Scalise in the restaurant's kitchen if he had seen Chili Pepper, a famous female impersonator who was a customer at the restaurant. Scalise responded, "[Chili Pepper] has got to be your honey. You've got to be taking it in the ass from him." In another incident, Scalise observed Alexander talking to Jason Clark, an openly gay restaurant host. He then asked Alexander if his "sissy lover" was helping him and if he was "going to go to the washroom now and blow him." When Alexander later told Scalise that he wanted to hire Clark for a host position, Scalise told him: "We don't want any more gays, we've already got you, one dick sucker is enough."

¶ 9    Alexander testified that Schwab repeatedly accused him of having sex with Steven Gaither, the restaurant's graphic artist. Schwab made these comments approximately two to three times per week and every time Gaither was mentioned in a business discussion. On one occasion after Alexander returned from Gaither's office, Schwab said that he was "glad [he] could tear [Alexander] away from Gaither's dick." An audio tape containing three of the messages Schwab left on Alexander's answering machine was admitted into evidence. In one of the messages, Schwab said, "If you can break away from Gaither's cock, give me a call." In another message, Schwab said, "Do you eat lunch from [unintelligible] while you are sticking Gaither in the ass, let me know." In the third message, Schwab said, "Are you fucking Gaither in the ass [unintelligible]."

¶ 10    Alexander testified that he first asked Schwab to stop making the comments in June 1999 because they made him uncomfortable. In July 1999, Alexander told Scalise that Schwab was calling him names, alluding to his sexuality, and making him uncomfortable. Alexander asked Scalise if he would talk to Schwab about it and Scalise said that he would. After that, Alexander said that the comments escalated. In the summer of 1999 during the restaurant build out, if Alexander was seen standing in front of the restaurant talking to a man, Scalise and Schwab would ask Alexander if that was his honey and if he was "sucking him off."

¶ 11    Alexander stated that he asked Scalise and Schwab to stop making the comments at least 10 to 20 times throughout the entire term of his employment but the comments never stopped. He said the comments made him feel completely humiliated and demoralized. He suffered from vomiting, diarrhea and nausea. He had difficulty sleeping and saw a doctor who prescribed Xanax. Alexander said that he could not say with certainty what Schwab and Scalise thought about his sexual orientation, but that his impression was that they thought he was homosexual based on the names they called him and the comments they made. Alexander testified that he is not, in fact, homosexual.

¶ 12    Jeffrey Ingraffia testified that his friend Daniels introduced him to Alexander when Daniels and Alexander were discussing their plans for the restaurant. Before the restaurant opened, Ingraffia would stop by every few weeks. In the fall of 1999, Ingraffia and Daniels agreed to meet at the restaurant, where they spoke to Alexander about the design plans. While Alexander was explaining what type of drapes the restaurant would have, Scalise came

-4-

over and said that was not how the drapes were going to be. Ingraffia testified that Scalise called Alexander a "cocksucker" and a "fag." Ingraffia said that the incident was very unpleasant and made him feel uncomfortable. After the restaurant opened in April 2000, Ingraffia was waiting at the bar for some friends and he saw Scalise at the bar. Ingraffia asked another employee if Alexander was around because he wanted to congratulate him and Scalise said, "He's in the back sucking somebody's dick."

¶ 13    Daniels testified that around July 1999, he and Alexander had weekly meetings with Scalise and Schwab. At the first meeting, Alexander, Scalise and Daniels walked together to the restaurant where they planned to meet and Alexander stopped to talk to someone outside the restaurant. Scalise and Daniels went in and sat down at a table. Scalise looked out the front window at Alexander and the person he was talking to and said to Daniels, "This guy is a total fag. And he's probably sucking that guy's dick." On cross examination, Daniels was asked about his deposition in which he said that Scalise said, "I think [Alexander] is fucking [that guy] in the ass." Daniels said that it was his recollection that his testimony at the deposition accurately reflected what Scalise said.

¶ 14    Daniels visited the restaurant several times a week during the build out and testified that Schwab and Scalise degraded Alexander every time Daniels was there. Schwab frequently called Alexander "sissy" and "Marybeth" and it was apparent to Daniels that it was not done in jest but with antagonism. In one particular incident just a few months before the opening of the restaurant, Alexander was describing the drapes to Daniels and Ingraffia and Scalise walked over and started shouting at Alexander and calling him a "dick sucking sissy."

¶ 15    Daniels testified that during the build out, Alexander worked on construction issues such as arranging for workers to build the stainless steel bar. He also worked on the design of the restaurant and acquired things for the restaurant such as kitchen equipment. Daniels was satisfied with Alexander's job performance both during the build out and after the restaurant opened. Daniels testified that Ken Sheridan was hired as a "back of the house" manager a few months before the opening of the restaurant. Daniels said that his understanding was that Alexander and Sheridan were to have distinct roles.

¶ 16    Daniels learned that Alexander had been fired from Schwab. He said that Schwab initially told him that Alexander had been fired because he had not come to work for two weeks. Daniels responded that he found that hard to believe because every time he went to the restaurant or friends and family members of his went to the restaurant, Alexander was there. Daniels testified that Schwab then said Alexander had been fired because he was coming to work "coked up and yelling" at the employees. Daniels said that he called Alexander and asked him about the allegations and Alexander said they were not true. A few months after Alexander was terminated, the restaurant closed.

¶ 17    Sheridan testified that he was hired in September 1999 as the general manager of the restaurant. Sheridan did not know Alexander personally before he started working at the restaurant, but he knew of Alexander's reputation for attracting celebrities and being responsible for some of the "hotter" nightclubs or restaurants in the city. Sheridan understood Alexander's role as being responsible for the creativity and concept behind the restaurant and the person who would be interacting with guests and ensuring the service was what it needed

to be. Sheridan was aware of Alexander's injury and had seen Alexander on crutches and wearing a special protective shoe. Sheridan testified that Schwab called Alexander a "gimp" and told him to "lose the shoe." Sheridan also heard Schwab say that Alexander could not go back for another surgery because then he would be on crutches and they could not have him limping or "being a gimp" at the restaurant. Sheridan felt that the comments were malicious and that Schwab was not joking. Sheridan stated that Scalise said he did not want any "faggot" working for the restaurant and he did not want any "faggot" in the restaurant. When discussing the possibility of hiring Clark, who was openly gay, as a host, Scalise said that they did not want to hire him because "he's a faggot and he'll bring faggots in here and that's not the environment we want."

¶ 18    Sheridan heard Schwab and Scalise make inappropriate comments to or about Alexander on a regular basis. He initially thought it was merely inappropriate but as time went on he came to believe that it was intentional and malicious. Sheridan told Schwab and Scalise that he thought the comments were inappropriate. He testified that Alexander was called "pussy," "faggot," and "cocksucker." Whenever Alexander had been with Gaither, he was asked when he returned if he had been "out sucking Gaither's dick" or if he "takes it in the ass from Gaither." Sheridan could not recall whether Scalise made any of the comments, but he heard Schwab make them. The comments were made on a regular basis in front of Sheridan, Alexander and possibly other managers. The comments regarding Gaither were made constantly and whenever there was a conversation related to Gaither. Sheridan testified that he did not think Alexander was homosexual, but he thought that Scalise and Schwab believed that to be the case.

¶ 19    Sheridan testified that he and Alexander had an ongoing disagreement over job responsibilities and whether Sheridan worked under Alexander. Sheridan understood that he was the general manager and was in charge of everything except the front desk, the decor, the menu and the kitchen once the restaurant opened. During the build out, Sheridan said that eventually he had to meet with tradesmen early in the morning, set schedules, and ensure that people were paid for the work they did because Alexander was not fulfilling those responsibilities. Sheridan testified that although it was Alexander's responsibility to train the host stand, he did not perform that function. Sheridan said that he and Alexander had an argument about Sheridan's ability to make decisions. Sheridan felt that Alexander did not respect his background because he had previously worked for theme restaurants such as the Rainforest Café.

¶ 20    By the time the restaurant opened, Sheridan's relationship with Alexander had deteriorated and he brought his concerns about the operation to Scalise and Schwab. During these conversations, Schwab would call Alexander a "cunt" or "pussy." Sheridan sensed a lot of animosity toward Alexander, and said that Schwab and Scalise asked him if it was possible to get rid of Alexander. In another conversation with Schwab and Scalise, Sheridan testified that Scalise said that he could have it released in the papers that Alexander was fired for stealing from them. Shortly before Alexander was fired, Sheridan resigned as general manager because the working relationship with Alexander became too difficult. After his resignation, Sheridan had an altercation with Scalise in which Scalise threatened to kill Sheridan and his family.

¶ 21    Schwab testified that he acted as Scalise's designee in exchange for a future interest in the venture. During the build out, Schwab put in 20 to 30 hours a week at the restaurant. He did not receive compensation for the hours he worked. Schwab testified that he became frustrated with Alexander and admitted that he called him names as his frustration grew. Schwab stated that the word "faggot" is not in his vocabulary, but he could not say that he did not use it. He also said that the words "fag" and "homo" were not in his vocabulary. Schwab said that the name he remembered calling Alexander was "Marybeth." Schwab acknowledged that he may have called Alexander "cunt," "queer," "queen," or "sissy." He denied calling Alexander "pussy," "dicksucker" or "cocksucker." Schwab said that the reason he called Alexander "Marybeth" is because Alexander would leave long messages on Schwab's cell phone complaining about everyone at the restaurant and that Schwab told him that if he was going to whine like a little girl, Schwab would call him "Marybeth."

¶ 22    Schwab stated that there was never any sexual connotation associated with the name calling, and said that he knew Alexander was not homosexual. He explained that his knowledge was based on the fact that Alexander had a girlfriend, a daughter and an ex-wife, although Schwab acknowledged that this did not preclude someone from being homosexual. Schwab stated that Alexander never complained to him about any of the name calling and said that if Alexander had complained, he would have stopped. Schwab acknowledged that when he could not find Alexander and then received a message that Alexander was with Gaither, he would make remarks about Alexander engaging in sex acts with Gaither. Schwab said that he never intended for his comments to be taken literally and that he was just joking. He also said that he made the comments out of frustration because Alexander was never available when he was looking for him.

¶ 23    Schwab testified that during the build out, he expected Alexander to be at the work site by 9 or 10 a.m. to make sure the work was being carried out according to the plans and designs. However, Schwab said that Alexander would not arrive until late in the afternoon and that Schwab had to go to the restaurant on almost a daily basis to give his input. Schwab said that he called Alexander but would not get an answer. When Sheridan was hired as general manager, Sheridan would frequently go to the restaurant and give direction to the construction crews or purchase materials. Schwab testified that the basis for Alexander's termination was that during the last week of his employment, he stopped showing up at the restaurant.

¶ 24    Ziad Mansour testified that he was hired as the restaurant's executive chef during the build out. Mansour said that he had known Alexander for more than 20 years and that he considered him a personal friend. He stated that during the build out, he observed Alexander's involvement in every aspect of the construction, from working with the architect, the graphic designer and the contractor, to procuring equipment and accessories for the restaurant. Mansour testified that he first heard Schwab making comments suggesting that Alexander was homosexual during the build out. Schwab would call Alexander names such as "sissy," "faggot," and "suck dick" in front of Mansour, Sheridan, the sous chef and some other people. Mansour also heard Schwab make comments about Alexander and Gaither.

¶ 25    Mansour stated that Chili Pepper, a female impersonator, lived next door and would stop

by the restaurant. On one such occasion, after Chili Pepper left the restaurant, Scalise asked Alexander what he was doing with him. Alexander responded that Chili Pepper was a famous person and the restaurant needed to show him hospitality. Scalise then asked Alexander if he was "sucking his dick." Mansour was also present during a discussion about the possibility of hiring Clark and testified that both Scalise and Schwab said they did not want a "gay image" in the front. Mansour testified that he was present when Scalise fired Alexander. He said that Scalise gave Alexander an envelope and told him to sign something inside the envelope and that he was being fired. Scalise told Alexander that if he did not sign, he would tell people Alexander had been robbing the restaurant.

¶ 26     Scalise testified that when he became a majority owner in the 1212 venture, he did not have the time to oversee the daily progress at the restaurant site and Schwab was his designee. During the build out, he had conversations with Schwab about the progress and learned that Alexander was not coming to the construction site in the mornings when Schwab asked him to be there. Scalise hired Sheridan as the general manager in September and did not initially expect him to have much involvement with the build out. However, Sheridan had to take over Alexander's duties such as meeting the contractors and making decisions about the construction of the building in Alexander's absence.

¶ 27     Scalise said that he heard a lot of name calling at the restaurant, but he only remembered two names being used on a daily basis. He stated that Schwab called Alexander "Marybeth" and Alexander called Schwab "buttercup." Scalise remembered Sheridan coming to him about the unprofessional relationship between Schwab and Alexander but did not recall whether Sheridan told him that he was uncomfortable with the names Schwab called Alexander. Scalise acknowledged that he had called Alexander a "cunt," but denied making comments about Alexander being homosexual or engaging in sex acts with other men.

¶ 28     Scalise said that when Alexander was trying to hire Clark, he asked Sheridan and Alexander for their opinion on the effect that would have on the restaurant. Scalise denied saying that he did not want to hire another gay person because having Alexander was enough. He said that from a business standpoint, he merely wanted to know if it would be positive or negative, and Alexander told him it would probably be positive. Scalise said that he approved Clark's hiring but he claimed that Clark called in sick on the first day, so Scalise told Sheridan to fire him.

¶ 29     Scalise testified that he never believed that Alexander was homosexual because he had been introduced to a woman he believed was Alexander's girlfriend and also to Alexander's daughter. He said that Alexander told him that when you run these types of bars, all the girls want you. Scalise said that Sheridan told him that he did not know how much longer he could work with Alexander. Scalise told Sheridan that he would fire Alexander, but Sheridan had already accepted another position. Scalise testified that he never threatened Sheridan or his family. After Sheridan left, Scalise had a meeting with Alexander, Schwab and Mansour. He testified that at the meeting, Alexander said, "Now that [Sheridan's] gone, let's run things my way." Scalise told Alexander that he had not been able to count on him up until that point, so he was not planning to turn everything over to Alexander and would instead hire a new general manager. Scalise testified that after that meeting, Alexander's attendance, which had already been poor, became even worse and Alexander stopped showing up

altogether.

¶ 30    On June 12, 2000, Scalise testified that he met with Alexander at a location outside the restaurant and told him he was being fired for cause. Scalise told Alexander he had prepared a separation agreement and suggested that Alexander have an attorney look at it and then get back to Scalise with a response to the agreement. Scalise said that he asked Alexander not to "trash" the place when discussing the restaurant and said that in return, he would not say anything negative about Alexander. They returned to the restaurant and Alexander asked if they could have a meeting with Mansour. Alexander told Mansour that Scalise had just fired him, and Mansour asked why. Scalise told him that he had fired Alexander for cause.

¶ 31    Rina Infelise testified that she was hired as a host for the restaurant. She heard about a new restaurant opening up and when she went to apply for a position, she found out that her second cousin, Scalise, was part owner of the restaurant. Her involvement prior to the opening of the restaurant was limited to orientation and training on her specific job functions, which included answering the telephone. Infelise said that when she started, Alexander was always there during the times she was there, but as time went on, he would arrive later and would call before coming in to see how things were going and to ask who was there. Infelise testified that she never heard Scalise call Alexander names. The only names she heard Schwab call Alexander were "Greek," "Rod Stewart," and "Marybeth." She said that Alexander seemed indifferent to the names as if he and Schwab were just friends "kidding around." Infelise stated that Alexander was supposed to be in charge of party planning but she ended up taking that job over because it was not getting done.

¶ 32    Adam Lebine, a server at the restaurant, testified that he did not think Alexander was gay because he had a girlfriend and Lebine had seen how Alexander interacted with women. Lebine testified that he worked five nights a week and that Alexander would arrive after the restaurant opened and was usually gone before all of the guests finished arriving. On one occasion, Alexander pinched Lebine on the cheek in the dining room in front of the guests. Lebine said it made him feel like he was two years old.

¶ 33    Malaika Marion was also a server at the restaurant. She testified that she saw Alexander pinch Lebine's cheek and she thought it was inappropriate. She said she could tell Lebine was annoyed and she could tell it was a problem for him. Marion also stated that Alexander had problems with another employee, Brittany Milligan. She said that Alexander could never remember Milligan's first name and she would get very upset and cry about it. Marion never heard Scalise or Schwab call Alexander a derogatory name or make a comment about him having sex with another man.

¶ 34    Milligan was initially hired to be a service trainer at the restaurant but became a manager shortly after she was hired. Milligan said that she did not think that Alexander was gay because she knew of his prior marriage and had met his girlfriend. She also said that he was very flirtatious with women. Milligan said that she heard Alexander call Schwab "buttercup" and Schwab call Alexander "Marybeth." She said that they seemed like pet names. Milligan never heard Scalise call Alexander a derogatory name. Milligan said she quit because she hated working with Alexander. She said she became unhealthy and overworked and lost a lot of weight. She felt that nothing she did was ever good enough and she suffered from

emotional stress. Milligan testified that she believed she was higher in the chain of command at the restaurant than Alexander was. Milligan said that she did not like Alexander, and one of the reasons she did not like him was that he called her "Bridget" because he could not remember her name.

¶ 35    Robert Grotz testified that he was a bar manager and assistant general manager at the restaurant. Prior to opening, Grotz was responsible for setting up the bar and helping to hire the front of the house staff. Grotz was at the restaurant during the build out and said that Alexander and the contractor had problems and Sheridan eventually had to become the "middle man." Grotz said that when the restaurant opened, Alexander was usually there when customers arrived but sometimes he would not get there until later. Grotz said that Schwab would call Alexander "Marybeth" and Alexander would laugh. Grotz said that he did not think Alexander was gay because he had a girlfriend.

¶ 36    Mark Robinson was hired as a server at the restaurant and later became a manager. He testified that he did not believe Alexander was gay because he had a girlfriend and because Alexander's daughter worked at the restaurant for a while. Robinson said that during the build out, Alexander would arrive late in the afternoon and stay for a few hours. Robinson said that he never heard Scalise or Schwab make comments about Alexander having sex with other men and the only name he heard was "buttercup." He said Alexander was never called this name in front of guests or staff and that it was done in jest.

¶ 37    Alexander was then recalled. He acknowledged that he had called Schwab "buttercup" a few times in response to the name calling by Schwab, but that he stopped when he realized the names and comments were getting "pretty nasty." Alexander said that during the build out, he consistently let Schwab know where he was and what he was doing for the restaurant. Alexander stated that the witnesses who testified on behalf of Scalise, Schwab and 1212 were hired as servers, and some were subsequently promoted to floor supervisor or bar manager, but none of them were involved in the meetings between himself, Schwab, Scalise, Sheridan and Mansour. Alexander said that Clark called in the day after he was hired because there was a death in his immediate family. He stated that Clark informed both Alexander and the manager on duty. Alexander said that Schwab left more than three messages on his home answering machine with comments that were similar to the ones that were entered into evidence, but that the 3 messages that were played were the only ones that were still on the tape in his answering machine.

¶ 38    Although the hearing was conducted in 2005, as of April 8, 2008, the original hearing officer had not issued a decision in the case. The matter was assigned to a different hearing officer and on May 5, 2008, the new officer entered an order stating that pursuant to the request and agreement of the parties, a decision would be rendered based solely upon the trial transcripts and the previously submitted briefs. The order noted that this could require the hearing officer to make credibility determinations based upon inconsistencies in the transcript and that such determinations could be made only after stipulation by the parties. The order concluded that the current hearing officer, who had not observed the witnesses, would only make credibility determinations on the basis of the transcripts.

¶ 39    The Commission entered an order on liability and relief on October 30, 2008. The

Commission found that Alexander's termination was not based on his perceived sexual orientation. However, the Commission also found that Scalise, Schwab, and 1212 violated the Chicago Human Rights Ordinance (Chicago Municipal Code § 2-160-030 (1990)), by creating and tolerating a hostile environment based upon Alexander's perceived sexual orientation. The Commission awarded Alexander $35,000 in emotional injury damages and $140,000 in punitive damages. The Commission entered a final order on attorney fees and costs on April 15, 2009, awarding Alexander a total of $84,473.06. On February 19, 2010, the circuit court upheld the Commission's findings, damages awards, and the award of attorney fees and costs. Plaintiffs timely filed this appeal.

¶ 40                                                      ANALYSIS

¶ 41       On appellate review of a final decision issued by an administrative agency, this court considers the agency's decision rather than the decision of the circuit court. *Powell v. City of Chicago Human Rights Comm'n*, 389 Ill. App. 3d 45, 54 (2009). The degree of deference given to the agency's decision turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001).

¶ 42       The agency's findings and conclusions on questions of fact are held to be *prima facie* true and correct and will not be overturned unless the agency exercised its authority in an arbitrary or capricious manner or unless its decision is against the manifest weight of the evidence. *Powell*, 389 Ill. App. 3d at 54. The role of this court is not to reweigh the evidence or make an independent review of the facts but, rather, to ascertain whether the agency's final decision is just and reasonable in light of the evidence presented. *Godinez v. Sullivan-Lackey*, 352 Ill. App. 3d 87, 90 (2004). If the record contains any evidence that fairly supports the agency's decision, the decision must be upheld on review. *Id.*

¶ 43       A mixed question of law and fact asks the legal effect of a given set of facts; thus, a reviewing court must determine whether established facts satisfy applicable legal rules. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005). An agency's conclusion on a mixed question of law and fact is reviewed for clear error, with significant deference afforded to an agency's experience in construing and applying the statutes that it administers. *Id.* The agency's decision will not be overturned unless the reviewing court is left with the definite and firm conviction that a mistake has been committed. *Id.* Finally, our review of an agency's conclusion on a question of law is *de novo*. *Id.* at 471.

¶ 44       The Chicago Human Rights Ordinance (ordinance) prohibits the direct or indirect discrimination "against any individual in hiring, classification, grading, discharge, discipline, compensation or other term or condition of employment" because of the individual's sexual orientation. Chicago Municipal Code § 2-160-030 (1990). "Sexual orientation" is defined as "the actual or perceived state of heterosexuality, homosexuality or bisexuality." Chicago Municipal Code § 2-160-020(l) (1990). The applicable regulations implementing the ordinance prohibit harassment on the basis of actual or perceived membership in a protected class, which includes sexual orientation, and impose an affirmative duty on an employer to

maintain a work place free of harassment. City of Chicago Comm'n on Hum. Relations Reg. 100(27), 345.100 (2008). The regulations define harassment as:

"Slurs and other verbal or physical conduct relating to an individual's membership in a Protected Class *** constitutes harassment when this conduct:

(a) has the purpose or effect of creating an intimidating, hostile or offensive working environment;

(b) has the purpose or effect of unreasonably interfering with an individual's work performance; or

(c) otherwise adversely affects an individual's employment opportunities." City of Chicago Comm'n on Hum. Relations Reg. 345.110 (2008).

¶ 45    The regulations also provide:

"An employer is responsible for its acts and those of its agents and supervisory employees with respect to harassment on the basis of membership in a Protected Class *** regardless of whether the specific acts complained of were authorized or forbidden by the employer and regardless of whether the employer [knew] or should have known of their occurrence." City of Chicago Comm'n on Hum. Relations Reg. 345.120 (2008).

¶ 46    Appellants first contend that the Commission committed errors of law in concluding that the ordinance applies to hostile work environment claims and that Alexander was a member of a protected class. Appellants argue that the ordinance applies only to adverse employment actions, not to hostile work environment claims. Appellants further contend that because Alexander was not homosexual, he lacked standing to file a claim for harassment on the basis of sexual orientation.

¶ 47    As noted in both of the proceedings below, these claims have no merit. First, the ordinance plainly prohibits discrimination against an individual in any term or condition of employment based on sexual orientation, which is defined as the actual or perceived state of heterosexuality, homosexuality or bisexuality. Moreover, the regulations implementing the ordinance clearly and unambiguously state that the ordinance prohibits harassment on the basis of actual or perceived membership in a protected class, and define harassment to include slurs relating to an individual's membership in a protected class that have the purpose or effect of creating an intimidating, hostile or offensive work environment.

¶ 48    Appellants next contend that neither Schwab nor Scalise perceived Alexander to be homosexual and that the Commission made an error of law in stating that even if the appellants had not perceived Alexander to be gay, their actions constituted a violation of the ordinance. The Commission found that Scalise and Schwab each perceived Alexander to be either gay or bisexual. This finding was based in part on Scalise's statement to Daniels that Alexander was "a total fag," and on Scalise's statements to Sheridan and Alexander regarding not wanting to hire "faggots." The Commission noted that virtually all of the offensive comments were related to Alexander's perceived sexual orientation and the most offensive comments contained references to sexual acts with other men, two of whom were known to be homosexual.

-12-

¶ 49    The record supports the Commission's finding. The Commission determined that Sheridan was the most credible witness at the hearing. Sheridan testified that Schwab and Scalise both called Alexander offensive names relating to his sexual orientation and that Schwab made frequent references to Alexander engaging in sexual acts with other men. Sheridan stated that he thought both Scalise and Schwab believed Alexander was homosexual. Daniels testified that Scalise told him at one of their initial meetings that he thought Alexander was gay, and there was no indication that it was said in jest. Ingraffia testified that on one occasion when he was looking for Alexander, Scalise told him Alexander was currently engaged in a sex act with another man. Alexander and Mansour testified about an incident in which Scalise suggested that Alexander was engaging in sexual acts with Chili Pepper. The record also contains evidence of three messages left by Schwab in which he accused Alexander of engaging in sexual acts with another man. Moreover, Sheridan testified that Schwab made comments relating to Alexander's sexuality even when Alexander was not present. Thus, we cannot conclude that the Commission's finding was against the manifest weight of the evidence. Because we are upholding the Commission's finding that Scalise and Schwab perceived Alexander's sexual orientation to be homosexual, we need not address the Commission's alternative finding that even if Scalise and Schwab had not perceived Alexander to be heterosexual, their actions constituted a violation of the ordinance.

¶ 50    Appellants next contend that the Commission erred in stating that Scalise could be held liable for "his own *** inactions." Appellants argue that under the regulations implementing the ordinance, only employers have a duty to prevent harassment and Scalise was not Alexander's employer. We note that appellants do not challenge the Commission's statement that Scalise and Schwab are liable for their own actions. The Commission agreed that 1212 was Alexander's employer, not Scalise. The Commission concluded, however, that Scalise was personally liable "for his own actions or inactions."

¶ 51    We note that appellants' brief contains one paragraph related to this issue in which the only citation to authority is to case law relevant to principles of statutory interpretation where a statute defines its own terms. See *Boaden v. Department of Law Enforcement*, 267 Ill. App. 3d 645, 651-52 (1994). Even if the Commission erred in including the words "or inactions" in its statement regarding Scalise's liability, the Commission found that Scalise, irrespective of Schwab's conduct, created and fostered a hostile environment by personally engaging in repeated offensive conduct directed at Alexander. In their reply brief, appellants further explain that the award of identical damages against Scalise and Schwab demonstrates that the Commission improperly imputed Schwab's conduct to Scalise. However, there is no further development of this argument and no citation to relevant authority. It is well settled that the appellate court is entitled to a well-reasoned argument, along with authority for such argument. See *People v. O'Malley*, 356 Ill. App. 3d 1038, 1046 (2005). "Mere contentions without argument or citation [to] authority do not merit consideration on appeal." *Eckiss v. McVaigh*, 261 Ill. App. 3d 778, 786 (1994). "[A]rguments inadequately presented on appeal are waived." *Id.* Thus, we deem this issue to have been waived and decline to determine whether the Commission erred in including the words "or inactions" in its statement discussing Scalise's liability.

¶ 52    Appellants next contend that the Commission improperly reversed the burden of proof by requiring appellants to disprove a hostile environment. In support of this contention, appellants cite to two statements made by the Commission in the section of its decision devoted to the facts related to the harassment claim. This argument has no merit. In the first statement, the Commission merely observed that just because not all of the employees who testified witnessed the harassment did not mean that it did not take place. This statement does not establish that the Commission shifted the burden of proof. The Commission discussed at length the evidence that was presented in support of the harassment claim and simply observed that the testimony of the appellants' witnesses who did not hear the offensive comments was not dispositive on the issue of whether or not the comments were made.

¶ 53    In the second statement, the Commission concluded that in the absence of testimony that Alexander would normally have recorded every comment in his "diary," the lack of such entries was not proof that the comments were not made. Again, this statement does not establish that the Commission shifted the burden of proof. The record discloses that the "diary" was in fact a daily calendar with random notes written in it by Alexander. The Commission was addressing the argument made by appellants that what was not in the diary should be considered evidence that the comments were not made. The Commission rejected this argument because it determined that it was never established that the maintenance of the so-called diary was reliable, and therefore, the Commission discounted the diary in its entirety. We find no support in the record for appellants' contention that the Commission shifted the burden of proof.

¶ 54    We now turn to appellants' arguments involving the Commission's findings. Appellants challenge the Commission's credibility findings, its findings that both Schwab and Scalise created a hostile work environment, and its finding that Alexander suffered emotional distress. Appellants first contend that the Commission erred in finding Daniels, Mansour and Ingraffia credible and the "former managers" not credible on the issue of a hostile work environment. It is not clear who the appellants are including in the "former managers" category. In the section of the brief containing this argument, Sheridan, Infelise, Lebin, Marion, Grotz, Robinson and Milligan are mentioned in the context that they testified Daniels was only at the restaurant a few times. We note that some of these witnesses were servers, not managers. We further note that these witnesses are only mentioned in the context of the impeachment of Daniels, and no argument is developed in this section to support the statement that these witnesses were credible on the broader issue of a hostile work environment.

¶ 55    As noted above, "[m]ere contentions without argument or citation to authority do not merit consideration on appeal." *Eckiss*, 261 Ill. App. 3d at 786. Therefore, to the extent that we can ascertain clear arguments related to the credibility of Daniels, Mansour and Ingraffia, we will address those arguments. The Commission determined that Sheridan was the most credible witness and there is support in the record for that conclusion. Sheridan had nothing to gain from his testimony and did not have a personal relationship with either party. Moreover, his testimony supported both Alexander's hostile work environment claim and appellants' argument that Alexander was terminated for cause. The Commission noted

-14-

Mansour's bias as a personal friend of Alexander, and observed that his testimony was credited only to the extent that it was corroborated by Sheridan. The Commission rejected appellants' argument that Daniels was biased and noted that he satisfactorily explained the discrepancy between his deposition and hearing testimony. An opposite conclusion is not clearly evident from the record. The Commission rejected appellants' argument that Ingraffia was impeached by his prior deposition testimony for denying that he ever had a private conversation with Scalise when he explained at the hearing that they were in the presence of a bar full of people. The record supports this conclusion. Thus, we cannot conclude that the Commission's credibility findings were arbitrary and capricious or against the manifest weight of the evidence.

¶ 56    Appellants further contend that the Commission erred in finding that Schwab and Scalise created a hostile work environment. Appellants argue that Schwab only made occasional comments out of frustration at Alexander's refusal to work, only left three vulgar messages and would have stopped making the comments if Alexander had asked him to do so. Appellants similarly argue that only three questionable comments were attributed to Scalise and there was no evidence that Scalise was aware of the messages left by Schwab.

¶ 57    The Commission observed that it would be hard to imagine a work place "more objectively offensive to an employee, more viciously permeated with anti-gay vitriol," than that which existed at the restaurant. The Commission found that Schwab called Alexander offensive names and made offensive comments relating to sexual orientation on a daily basis. The Commission found that Scalise made equally offensive comments on a regular basis, and that he was informed by multiple people of the inappropriate comments that were made by Schwab. The record supports these findings. Alexander's testimony that he was harassed on a consistent basis from the time he was hired was corroborated by a number of other witnesses, including Sheridan, the most credible witness at the hearing. Sheridan attributed the majority of the comments to Schwab and was not certain how frequently Scalise made the comments. Daniels, who was also found to be credible, testified that Scalise made a comment to him about Alexander's sexuality, and that he heard Scalise call Alexander names during the build out. Ingraffia also testified that he heard Scalise calling Alexander names during the build out. Mansour corroborated Alexander's testimony that Scalise accused Alexander of engaging in a sexual act with Chili Pepper. Sheridan corroborated Alexander's testimony that offensive comments were made by Scalise in the context of hiring Clark. Mansour and Alexander testified that Alexander complained to Scalise about the harassment by Schwab. Sheridan testified that he complained to Scalise about Schwab's treatment of Alexander. Thus, we conclude that the Commission's findings that both Schwab and Scalise created a hostile work environment were not against the manifest weight of the evidence.

¶ 58    Appellants also contend that the Commission erred in finding that Alexander suffered emotional distress on the basis of Alexander's testimony. The Commission noted that according to Alexander's testimony, the harassment was demoralizing and humiliating. He suffered from vomiting, diarrhea and nausea, which he attributed to the harassment. Although Alexander's treating physician saw him in early 2000 for complaints of diarrhea and chest pain, the Commission found that the physician did not sufficiently link the physical symptoms between January and June of 2000 to the harassment. However, the Commission

-15-

found that the physician's progress notes from December 1999, indicating that Alexander was having difficulty sleeping and was very stressed and depressed, corroborated Alexander's testimony regarding the severity of his emotional distress. We cannot conclude that an opposite conclusion is clearly evident from the record, thus, the Commission's finding of emotional distress was not against the manifest weight of the evidence.

¶ 59 Finally, appellants challenge the relief granted by the Commission. They contend that the actual damages award and the award of attorney fees and costs were arbitrary and capricious, and that the punitive damages award was an abuse of discretion. We note that the arbitrary and capricious standard of review is often equated with the abuse of discretion standard of review. See *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 496-97 (1988). The arbitrary and capricious standard is one of rationality, and the reviewing court will not substitute its own reasoning in the absence of a clear error of judgment on the part of the agency. *Id.* at 506.

¶ 60 We first address the actual damages award. Appellants cite to several Commission decisions in which the damages award was $5,000 to $10,000 for conduct that appellants deem to be "far more serious" than the conduct at issue here. In its decision, the Commission cited to and discussed Commission decisions with damages awards ranging from $5,000 to $50,000. The Commission compared the conduct at issue here with the conduct in the cited cases and determined that the facts most closely resembled a case in which the damages award was $30,000. Taking into account the cumulative rate of inflation, the Commission increased the award to $35,000.

¶ 61 Factors that are considered by the Commission in determining the amount of the award include: (1) the vulnerability of the complainant, (2) the egregiousness of the conduct; (3) the severity of the mental distress and whether it was accompanied by physical manifestations and/or medical or psychiatric treatment, and (4) the duration of the conduct and the effects of the distress. *Steward*, Chi. Hum. Rts. Comm'n No. 96-E-170 (June 18, 1997). The Commission has awarded damages in excess of $10,000 where: (1) detailed testimony revealed specific effects of the conduct, (2) the conduct took place over a prolonged period of time, (3) the effects of the mental distress were felt over a long period of time, (4) the mental distress was accompanied by physical manifestations and/or medical or psychiatric treatment, (5) the conduct was particularly egregious and was accompanied by face to face conduct, racial or sexual epithets and/or actual malice, and (6) the complainant was particularly vulnerable. *In re Nash*, Chicago Hum. Rts. Comm'n No. 92-H-128 (May 17, 1995). The Commission noted that Alexander's testimony concerning his distress was detailed and that the harassment was egregious and relentless and continued for a year. The Commission credited Alexander's testimony that he suffered physical manifestations of the harassment.

¶ 62 The record supports these conclusions. As noted above, Alexander's testimony regarding the length and severity of the harassment was corroborated by other witnesses and by the messages left on his answering machine. The physician's testimony and notes support Alexander's detailed descriptions of the physical manifestations of the harassment. The harassment was usually face to face and included sexual epithets, and several witnesses testified that the harassment was malicious. Finally, the testimony establishes that the

-16-

harassment began during the build out and continued for one year until Alexander's termination. Thus, the actual damages award of $35,000 was not arbitrary and capricious.

¶ 63    We now address the punitive damages award. "The purpose in awarding punitive damages is to punish an individual responsible for the wrongful conduct, to teach the individual not to repeat the wrongful conduct and to deter others from similar conduct." *Page v. City of Chicago*, 299 Ill. App. 3d 450, 463 (1998). Appellants rely on *Slovinski v. Elliot*, 237 Ill. 2d 51 (2010), for the proposition that the punitive damages award should not exceed the actual damages award. We find this reliance to be misplaced. In *Slovinski*, our supreme court upheld an appellate court decision reducing the punitive damages to an amount equal to that of the actual damages award. The court explained that the defamatory statements at issue in *Slovinski* were made only once in the presence of a limited number of individuals and there was no evidence of an intentional, premeditated scheme to harm the plaintiff. *Id.* at 64. The court further noted that there was no evidence of visits to a doctor, missed work, or any alteration in plaintiff's daily normal activities. *Id.* The court concluded that these facts put the conduct at issue on the low end of the scale for punitive damages. *Id.*

¶ 64    Here, the offensive comments were numerous and made at various times in front of various people. There was evidence of malicious intent and the Commission noted that the intended consequence of the comments was to humiliate, embarrass and cause distress. The Commission stated that while actual damages were moderate, the reprehensibility of the conduct was in mid-range, supporting a punitive damages award of up to seven times the amount of compensatory damages. The record supports the Commission's reasoning and we conclude that the Commission did not abuse its discretion nor did it act in an arbitrary and capricious manner. Therefore, we uphold the Commission's punitive damages award of $140,000.

¶ 65    Appellants also argue that the award of attorney fees was arbitrary and capricious because Alexander was unsuccessful on his wrongful discharge claim, his disability claim and his racial discrimination claim. Appellants therefore ask for at least a 50% reduction in fees. Appellants sought a 75% reduction in fees from the Commission, namely, a 25% reduction for each of the three unsuccessful claims. The Commission found that only one of the arguments had merit. The Commission explained that no evidence was presented at the hearing on the theory that Alexander's termination was based on his opposition to racial discrimination, and thus, Alexander abandoned this claim and there is no basis for a fee reduction based on the race discrimination claim. The Commission further noted that although evidence was presented regarding Alexander's injury that had relevance to the disability claim, it was also relevant to explain Alexander's absence from work and therefore was an issue that shared a common core of operative facts with the wrongful termination claim. The Commission found no basis to reduce the fee award based on the disability claim.

¶ 66    The Commission did agree that there was considerable testimony and briefing related to whether Alexander's termination of employment was motivated by his perceived sexual orientation. However, most of the evidence related to this claim would have also been presented with regard to the hostile environment claim. Therefore, the Commission followed a previous decision with similar facts and reduced the fee award by 15% to account for the unsuccessful wrongful termination claim. The Commission offered a well-reasoned analysis

-17-

for its decision to reduce the award by only 15% and the record supports this analysis. There is no evidence that the Commission acted in an arbitrary or capricious manner and we uphold the Commission's award of attorney fees and costs.

¶ 67      For the reasons stated above, we affirm the judgment of the circuit court, upholding the Commission's findings and awards.

¶ 68      Affirmed.